Michael L. Williams, OSB No. 784260
mwilliams@wdolaw.com
Leslie W. O'Leary, OSB No. 990908
loleary@wdolaw.com
Thomas B. Powers, OSB No. 983933
tpowers@wdolaw.com
Steven B. Seal, OSB No. 085384
sseal@wdolaw.com
WILLIAMS LOVE O'LEARY & POWERS, P.C.
12725 S.W. Millikan Way, Suite 300
Beaverton, OR 97005
Telephone:  (503)295-2924
Facsimile :  (503)295-3720

Christopher L. Cauble, Esq., OSB No. 962374
CCauble@thecaublefirm.com
Rachele R. Selvig, Esq., OSB No. 095016
RSelvig@thecaublefirm.com
CAUBLE & CAUBLE, LLP
111 SE Sixth St.
Grants Pass, OR 97526
Telephone: (541) 476-8825
Facsimile: (541) 471-1704

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| **LORRAINE BATES, EHRMAN BATES, EILEEN BURK;** and **DAVID YOUNGBLUTH,** | Case No. 3:13-cv-580 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| On behalf of themselves and all other similarly situated Oregon residents | **DEMAND FOR JURY TRIAL** |
| v. | |
| **BANKERS LIFE AND CAUSUALTY COMPANY,** a Illinois Insurance Company; a subsidiary of **CONESCO LIFE INSURANCE COMPANY OF TEXAS; CDOC, INC.** a Delaware Corporation; **CNO FINANCIAL GROUP, INC.,** a Delaware corporation; **James D. Peterson**, an individual and sales agent in Oregon;  and **DOE CORPORATIONS 1-100**, | |
| Defendants. | |

Page 1 – **CLASS ACTION COMPLAINT**

## STATEMENT OF JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because the plaintiffs and others similarly situated are Oregon citizens, several of the defendants are citizens of other states, and the amount in controversy exceeds $5,000,000, exclusive of interests and costs.

2.      Venue in this district is appropriate under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this district.

## INTRODUCTION

3.      This is a class action lawsuit filed by lead plaintiffs Lorraine Bates, Charles Ehrman Bates, Eileen Burk and David Youngbluth against defendant Bankers Life, its parent companies and its sales agents. Plaintiffs bring this action on their own behalf. They also represent similarly situated Oregon citizens, including elderly purchasers of Bankers Life long-term care insurance policies, as well as their spouses, family members, guardians and attorneys who assisted them in attempting to obtain the benefits owed under their Bankers Life policies.

4.      Plaintiffs assert claims of violations of Oregon's elder abuse statute (ORS § 124.110), breach of contract, fraud, negligence and intentional misconduct. Plaintiffs also seek damages that include economic damages, rescission and enhanced statutory damages for defendants' outrageous conduct.

5.      Plaintiffs thought they were doing the prudent thing for themselves and their families by purchasing long-term care insurance from Bankers Life to cover medical expenses in their old age. These policies promised to defray the costs of care providers at home or in assisted living facilities and nursing homes. Defendants led plaintiffs to believe that by purchasing this insurance, they were investing in a safety net. Plaintiffs faithfully paid their premiums for many years. But when they finally needed long-term care and submitted their claims, plaintiffs got the runaround. Defendants delayed in responding, ignoring repeated letters and phone calls, losing paperwork.

315252v1

6.      Defendants routinely rejected plaintiffs' claims on the false basis that their care providers did not meet the policy's criteria, when in fact, the policy definitions contained no such restrictions.  Only after months or years, and only after intervention by family members, lawyers and/or state agencies, would defendants relent and pay.  In some instances, defendants paid for only some – not all – of the benefits owed to plaintiffs.

7.      Defendants also denied paying plaintiffs their benefits altogether.  As a result, these plaintiffs have exhausted their personal assets and can no longer afford any long-term care.

8.      After plaintiffs purchased their policies, defendants unilaterally increased the premiums – by as much as 23% per year – without increasing the level of benefits.  Although plaintiffs regularly paid these increasing premiums for several years without submitting a claim, the policies paid only a fraction of their long-term care expenses.  Plaintiffs thus paid tens of thousands of dollars without knowing that defendants had no intention of providing the benefits they promised.

9.      Defendants' pattern of raising premiums, delaying payments and denying legitimate claims continues unabated today.

## THE PARTIES:  PLAINTIFFS

10.      Plaintiff Lorraine Bates is an adult who resides in Union County, Oregon with her husband, plaintiff Charles Ehrman Bates.  At all relevant times, plaintiffs Lorraine Bates and Charles Ehrman Bates were residents of Oregon.

11.      Plaintiff Eileen Burk is an adult who resides in Washington County, Oregon.  At all relevant times, plaintiff Eileen Burk was a resident of Oregon.

12.      Plaintiff David Youngbluth is an adult who resides in Crook County, Oregon.  At all relevant times, he was a resident of Oregon.  Plaintiff David Youngbluth is the son and attorney-in-fact of plaintiff Eileen Burk.

## THE PARTIES:  DEFENDANTS

13.      Defendant Bankers Life and Casualty Company ("Bankers Life") is a Delaware corporation with its principal place of business in Chicago, Illinois.  At all relevant times,

315252v1

Bankers Life has sold long-term care insurance policies to Oregon residents through its employees and sales agents. Bankers Life is a wholly-owned subsidiary of Conseco Life Insurance Company of Texas.

14.     Defendant Conseco Life Insurance Company of Texas ("CNCTX") is a Texas Corporation headquartered in Carmel, Indiana. At all relevant times, CNCTX has sold long-term care insurance policies to Oregon residents through its wholly owned subsidiary Bankers Life. CTCTX is a direct wholly-owned subsidiary of defendant CDOC, Inc.

15.     Defendant CDOC, Inc. ("CDOC") is a general business corporation is a purported Delaware corporation with its principal place of business in Carmel, Indiana. At all relevant times, CDOC has sold long-term care insurance policies to Oregon residents through CNCTX and its wholly-owned subsidiary Bankers Life. CDOC is a direct wholly-owned subsidiary of defendant CNO Financial Group.

16.     Defendant CNO Financial Group ("CNO") is a general business corporation and a Delaware citizen. At all relevant times, CDOC and its predecessor corporation Conseco Inc. were involved in managing claims on Bankers Life long-term care insurance policies.

17.     Defendants Bankers Life, CNCTX, CDOC and CNO are collectively referred to as "insurance company defendants."

18.     Defendant James D. Peterson ("Peterson") is an insurance agent who conducted business in Multnomah County, Oregon at all relevant times. Defendant Peterson was a sales agent for insurance company defendants. He sold plaintiff Eileen Burk and her husband a Bankers Life long-term care insurance policy in 1995.

19.     John Doe defendants 1-100 are sales agents employed by defendants to solicit Bankers Life long-term care policies to Oregon residents. Plaintiffs have not yet been unable to identify the names of these defendants, their addresses or states of citizenship.

20.     On information and belief, defendant John Doe 1 is an insurance agent from Walla Walla, Washington. At all relevant times, he was an insurance agent conducting business

in Union County, Oregon and sold a Bankers Life long-term care insurance policy to plaintiffs Lorraine R. Bates and Charles Ehrman Bates in 1998.

FACTUAL ALLEGATIONS

**A.    Defendants**

21.    Defendants and their sales agents targeted elderly Oregonians as a lucrative source of insurance premium revenues.  Defendants aggressively sold Bankers Life long-term care insurance policies to this population of retirees, promising them that the policies would give them the level of benefits sufficient to support them should they need nursing care, whether at home or at an assisted living facility.

22.    Defendants knew, however, that they could not deliver their promises because of the rising costs of healthcare for the elderly, and because they had underestimated how long policy holders would live in assisted living settings.  Defendants did not disclose this information to their policy holders, nor did they discourage them from purchasing long-term care policies.

23.    Defendants have sold thousands of long-term care policies to Oregonians over the past 20 years.  The premiums widely range from $100 to more than $500 per month.  After elderly Oregonians purchased these policies, defendants raised the premiums over time, by as much as 23 percent per year.

24.    When plaintiffs and other policy holders applied for benefits, defendants developed procedures intended to deny as many claims as possible. Examples of these procedures included, without limitation:

(A)    Employees were prohibited from responding to policy holders by telephone;

(B)    Defendants abandoned or denied claims without notifying policy holders;

(C)    Defendants routinely lost claim forms, medical records and other documentation provided by plaintiffs;

(D)    Employees were not allowed to contact one another to resolve problems with claims;

(E)     Defendants denied claims because of missing records, even though such records had been provided to them, sometimes repeatedly;

(F)     Defendants systematically denied claims on the false grounds that the policy-holder's long-term care providers did not comply with the policy requirements.

25.     Defendants have been the object of voluminous complaints by state agencies. In Oregon alone, Bankers Life has a far higher percentage of complaints for mishandling claims than any of its competitors. Bankers Life was responsible for an estimated 1/3 of all complaints reported by state insurance commissioners across the United States.

26.     In 2008, Kansas and 39 other states found that defendants engaged in a pattern of consumer harm. Defendants have paid more than $32 million in fines and restitutions, but their conduct persists, and complaints about abuses in its handling of long-term care policies continue to grow.

**B.      Plaintiffs Lorraine R. Bates and Charles Ehrman Bates**

27.     Defendant John Doe 1 sold plaintiff Lorraine Bates and her husband, plaintiff Charles Ehrman Bates ("Ehrman Bates"), a Bankers Life long-term care insurance policy (No. 980,155,343), issued on or about June 30, 1998.

28.     On or about December 2009, plaintiff Lorraine Bates moved into Janet's Adult Foster Home in Union County, Oregon because she could no longer live in her home with her husband, Charles Ehrman Bates.

29.     On or about December 2009, Ehrman Bates submitted a claim for Lorraine Bates under their Bankers Life policy.

30.     On September 3, 2010 – approximately nine months after the submission of the claim – Bankers life sent a letter to Lorraine Bates stating it was denying her request because: 1) Bankers Life was "unable to determine if you qualify for benefits according to your policy," and 2) Janet's Adult Foster Home did not meet policy requirements. The letter further stated that

Janet's Adult Foster Home was not an eligible provider because it did not provide 24-hour nursing service supervised by a licensed nurse as required under the policy.

31.     Frustrated by the delays and denial, plaintiffs hired Oregon attorney J. Glenn Null to try to help obtain Lorraine Bates's policy benefits.

32.     On November 17, 2010, attorney Null sent a fax to Bankers Life requesting the support for the policy requirement that an adult foster care facility must provide 24-hour nursing service supervised by a licensed nurse.

33.     On December 8, 2010, Bankers Life sent a letter to attorney Null stating it had not received a copy of the license for Lorraine Bates's adult foster home, and that it had received no information regarding the care given by the adult foster home to Lorraine Bates. Again, Bankers Life stated that the adult foster home did not meet the policy requirements. Bankers Life did not enclose support for the stated policy requirement as requested by attorney Null.

34.     On February 8, 2011, attorney Null sent a letter to Bankers Life, once again requesting the policy definition upon which it based its denial of Lorraine Bates's claim.

35.     On March 4, 2011 – approximately 3-1/2 months after attorney Null's initial request – Bankers Life sent a copy of Lorraine Bates's policy to attorney Null. The policy's "Definitions" state in relevant part:

> "Adult Foster Care Facility" means any family home or facility licensed as an Adult Foster Care Facility by the Senior and Disabled Services Division of the Mental Health and Developmental Disability Services Division of the Department of Human Resources to provide room and board and services that assist a family member with the following regular and customary activities of daily living: Transferring (includes walking and getting in and out of bed), continence, dressing, toileting, and eating.
>
> "Adult Foster Care Facility" does not include care provided in any home, institution, hotel or other similar place that supplies room and board only, if the family member does not require any assistance with the activities of daily living.

36.     Contrary to Bankers Life's representations in its September 3, 2010 letter, there is no requirement in the policy that an adult foster care facility must have 24-hour nursing service under the supervision of a licensed nurse.

37.     On March 15, 2011, attorney Null wrote to Bankers Life, once again requesting justification for its denial of benefits to Lorraine Bates based on the above language in the policy definition.   Attorney Null further noted that the adult foster home had provided its license number to Bankers Life on "multiple occasions via fax transmission and is supported by phone records."  Attorney Null carbon-copied the Oregon Insurance Division on the letter.

38.     Upon receipt of attorney Null's March 15, 2011 letter, Bankers Life informed him that it could have no further contact with him, and its only contact regarding Lorraine Bates's claim would be with the Oregon Insurance Commission.

39.     On June 30, 2011 – one year and seven months after Lorraine Bates's initial application for benefits – attorney Null was notified by the Oregon Department of Consumer and Business Services that Bankers Life would pay Lorraine Bates's claim retroactive to July 9, 2010.

40.     Plaintiffs Lorraine Bates and Ehrman Bates regularly and timely paid their premiums for approximately 11-1/2 years before either of them submitted a claim on their policies.   At the initial $277.65 monthly premium – not including any premium increases that occurred between 1998 and 2009 – plaintiffs paid approximately $38,315.70 before making their first claim.  The Bates's current premiums are $778.10 per month.

41.     Bankers Life paid Lorraine Bates's claim retroactively to July 9, 2010, thus burdening plaintiffs with approximately 7 months of adult foster care expenses (between December 2009 and July 2010) without reimbursement.   The Bates' Bankers Life Policy Schedules provide an elimination period of 30 days, meaning that benefits are payable after 30 days of receiving care services.

42.     Plaintiff Ehrman Bates continues to pay Bankers Life premiums but has not submitted a claim for long-term care benefits on his own behalf.

315252v1

### C.    Plaintiffs Eileen M. Burk and David Youngbluth

43.    Defendant James D. Peterson sold plaintiff Eileen Burk and her husband a Bankers Life long-term care insurance policy (No. 950,193,392), which issued on July 27, 1995. Mr. Burk passed away in October 2000 without having to make a claim on the policy.

44.    On or about December 2008, Eileen Burk suffered a fall.  As a result of her injury, she could no longer live in her home alone.  Ms. Burk moved into an assisted living facility in Tualatin, Oregon.  She has since moved to a facility in Sherwood, Oregon.

45.    On Ms. Burk's behalf, her son, plaintiff David Youngbluth, attempted to reach Bankers Life by phone in December 2008 and January 2009 to file a claim on her long-term care policy.  Bankers Life told Youngbluth that he had to submit a claim through the insurance agent who sold Ms. Burk and her husband the policy.  After repeated attempts, Youngbluth finally discovered that defendant Peterson was the agent.  After several phone calls, Youngbluth finally reached defendant Peterson, who made no effort to submit a claim under Ms. Burk's policy or to assist Youngbluth in doing so.

46.    Frustrated by his inability to reach someone to assist him at Bankers Life, Youngbluth hired Oregon attorney Anastaia Yu Meisner on behalf of Eileen Burk in December 2008 to try to file a claim.

47.    Attorney Meisner's office repeatedly tried to contact Bankers Life and defendant Peterson, the insurance agent, throughout December 2008 and January 2009, without success. These calls were met with ringing, unanswered phones.  On one occasion, attorney Meisner's office actually reached a person at defendant Peterson's office, who advised them that they had to file a claim with defendant Peterson, and that a message would be left for defendant Peterson to return the call.  Defendant Peterson did not respond at all.

48.    On January 26, 2009, attorney Meisner sent a letter to Bankers life requesting the procedure for making a claim on Eileen Burk's policy.

49.    On February 18, 2009, Bankers Life provided attorney Meisner with the requested claim form.  Due to the length of time Bankers life took to provide the claim form, and in an

315252v1

attempt to avoid further delays based on the intricacies of the claims process, attorney Meisner hired Health Advocate Services, LLC to gather and organize the information necessary to file the claim. Attorney Meisner submitted the claim form and the supporting paperwork in to Bankers Life in April 2009.

50.     On May 12, 2009, Bankers Life sent a letter to Eileen Burk, care of attorney Meisner's office stating, "[y]ou are eligible for benefits as of December 29, 2008 according to the terms and conditions of your policy and subject to any elimination period that may apply."

51.     On May 20, 2009, Bankers Life sent a letter to Eileen Burk, care of attorney Meisner's office, stating, "[w]e are paying the covered expenses beginning March 31, 2009 after after [*sic*] the 30 day elimination period ended."

52.     Under the terms of Eileen Burk's policy, Bankers Life does not pay for the first 30 days in a care facility. The time span between December 29, 2008 and March 31, 2009 is 93 days, not 30 days. Thus, Bankers Life was obligated to reimburse Eileen Burk for expenses incurred between January 29, 2009 and March 30, 2009.

53.     Despite the dogged efforts of Youngbluth and attorney Meisner's office, Eileen Burk did not receive reimbursement payments from Bankers Life under her policy until a year after she started receiving and paying for her care out of her own pocket.

54.     On December 17, Bankers Life sent a letter to Eileen Burk, care of attorney Meisner's office, stating that Bankers Life was waiving Eileen Burk's monthly premiums. The letter stated the waiver to be effective August 27, 2009. In February 2011, Bankers Life sent a check to Eileen Burk, care of attorney Meisner's office, in the amount of $1,000.26, as reimbursement for $166.71 monthly premiums paid between August 2009 and January 2010. Eileen Burk became eligible for benefits on December 29, 2008. According to Eileen Burk's policy, her premium waiver would start after Bankers Life paid benefits for 90 days in a row. Subtracting the first 30 days in the facility that Bankers Life did not pay, Bankers Life was obligated to reimburse Eileen Burk for monthly premiums she paid between April 29, 2009, 2008 and August 26, 2009.

315252v1

55.     Attorney Meisner's office then requested a copy of Eileen Burk's insurance policy.  On March 30, 2011, Banker's life sent Eileen Burk a "policy summary" with a schedule for Ms. Burk's Part I and Part II covered expenses.  Bankers Life did not send the complete policy.  The policy summary did not describe or explain the Part I or Part II covered expenses.  The policy summary did not define the terms "nursing home," "alternate facility" or "assisted living care."  The schedule stated that Ms. Burk's policy had a 30-day elimination period, and a maximum benefit period of three years for Part I covered expenses, and a 14-day elimination period and a maximum benefit period of one year for Part II covered expenses.

56.     On May 8, 2012, Bankers Life sent a letter to Eileen Burk, informing her that the "benefit maximum for this time period or occurrence has been reached."

57.     On May 9, 2012, Bankers Life sent a letter to Eileen Burk, informing her, "Your policy states that the Waiver of Premium must stop when benefits are no longer being received." In other words, because Bankers Life was no longer paying benefits to Eileen Burk, she had to start paying her monthly premiums again to keep this non-paying policy in effect.  The letter further stated that Bankers Life had increased Ms. Burk's policy premiums during the time the waiver was in effect and demanded payment of $417.88 within 10 days.  On two separate occasions, Youngbluth and attorney Meisner's office contacted Bankers Life, requesting to keep Eileen Burk's policy in effect by resuming payment of monthly premiums.  In both instances, Bankers Life told Youngbluth and attorney Meisner's office that Eileen Burk was no longer eligible.

58.     Without the Bankers Life benefits from her policy, Eileen Burk now pays approximately $4,135.00 per month for her assisted living facility.  This expense has drained her assets, and she is in danger of not being able to continue paying for her care.

59.     Eileen Burk's policy premiums increased by 91% over a four-year period, with no increase in benefits.  Her premiums rose from $109.48 per month in 2006 to $208.94 per month in 2010.

60.     Benefits under Eileen Burk's policy remained capped at $49.00 per day for assisted living care and $70.00 per day for nursing home care despite the rising costs of healthcare since 1995.  Even though Eileen Burk regularly paid increasing premiums for 13 years before she ever submitted a claim, her Bankers Life policy paid between $1,519.00 and $2,170.00 of her $4,135.00 monthly bill for assisted living.  By December 2009, when her son, plaintiff David Youngblood submitted her first claim, Eileen Burk had paid approximately $21,527.08 in premiums.

## CLASS ACTION ALLEGATIONS (FED. R. CIV. P. 23(b)(3)

61.     Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23(b)(3).

### The Class

62.     The class is composed of:

(A)     **Oregonians Whose Claims Have Been Delayed.**  Any person living in Oregon who purchased a Bankers Life long-term care insurance policy from defendants and whose claim for benefits was not paid within the time period required for payment; or

(B)     **Oregon Citizens Whose Claims Have Been Denied or Not Paid in Full.** Any person living in Oregon who purchased a Bankers Life long-term care insurance policy from defendants, and whose claim for benefits was either denied or not paid in full; or

(C)     **Family Members and Representatives Who Have Incurred Expenses Attempting to Obtain Benefits.**  Any spouse, relative, guardian or other legal representative acting on behalf of an Oregonian and who incurred expenses in their efforts to obtain benefits under a Bankers Life long-term care insurance policy; or

(D)     **Purchasers of Bankers Life Policies Who Have Not Made Claims.** Any person in Oregon who purchased a Bankers Life long-term care insurance

policy from defendants, but who have made no claims under the policy, and who want their contracts rescinded and their premium payments returned to them.

63.     The named representative plaintiffs are members of the classes they seek to represent.  Specifically:

(A)     Plaintiffs Lorraine Bates and Eileen Burk represent Class A above.

(B)     Plaintiffs Lorraine Bates and Eileen Burk represents Class B above.

(C)     Plaintiffs Charles Ehrman Bates and David Youngbluth represent Class C above.

(D)     Plaintiff Charles Ehrman Bates represents Class D above.

## Numerosity (Fed. R. Civ. P. 23(a)(1))

64.     The class is so numerous that joinder of all members is impracticable.  Plaintiffs conservatively estimate that there are at least 9,000 members of the class, all of whom are believed to be Oregon citizens or are relatives of Oregon citizens who purchased Bankers Life long-term care insurance policies.

## Commonality (Fed. R. Civ. P. 23(a)(2))

65.     There are questions of law and fact common to the class.  These common questions include, but are not limited to, the following:

66.     Whether defendants targeted plaintiffs and the class as a lucrative source of insurance policy revenues;

67.     Whether defendants fraudulently induced plaintiffs and the class to purchase long-term care insurance policies by promising them benefits defendants knew they would not provide;

68.     Whether defendants knew that the long-term care policies they sold to plaintiffs and the class would not cover the benefits promised to plaintiffs at the time they sold the policies;

69.     Whether defendants deliberately or negligently adopted a policy to make it so difficult for plaintiffs and the class to make a claim and receive benefits that they would either die or give up on their claims;

70.     Whether defendants deliberately or negligently adopted a policy to abandon or deny claims made by plaintiffs and the class without telling them;

71.     Whether defendants deliberately or negligently engaged in a pattern of delaying and denying claims of plaintiffs and the class for improper or unsubstantiated reasons;

### Typicality (Fed. R. Civ. P. 23(a)(3)

72.     The claims and defenses of the named plaintiffs are typical of the claims and defenses of the class.  The same events and conduct that gave rise to the claims, defenses and legal theories of the named plaintiffs also gave rise to the same claims, defenses and legal theories of the class.

### Adequacy (Fed. R. Civ. P. 23(a)(4)

73.     The representative parties will fairly and adequately protect the interests of the class.  There are no disabling conflicts of interests between the class representatives and the class.  The named plaintiffs are part of the class, possess the same interests, and suffer the same injuries as the class members, making their interests coextensive with those of the class.  The interests of the class representatives and the class are so identical that the motive and inducement to protect and preserve them are the same in each.

74.     The class is represented by experienced counsel well-qualified to handle this case. This lawsuit will be capably and vigorously pursued by the class representative and its counsel.

### Superiority (Fed. R. Civ. P. 23(b)

75.     A class action is superior to other methods for the fair and efficient adjudication of the controversy, for reasons that include the following:

76.     The prosecution of separate actions by individual members of the class creates a risk of inconsistent or varying adjudications with respect to members of the class and would establish incompatible standards of conduct for defendants.  Fed. R. Civ. P. 23(b)(1)(A).

315252v1

77. Questions of law and fact common to the members of the class predominate over any questions affecting only individual members. Questions affecting individual members primarily involve only calculations of individual damages. Fed. R. Civ. P. 23(b)(3).

78. Because of the amounts at stake for any individual class member, it is financially unrealistic for them to litigate their claims individually. On the other hand, a class action will allow all class members to obtain significant relief. Fed. R. Civ. P. 23(b)(3)(A).

79. Other litigation does not impede this case. Fed. R. Civ. P. 23(b)(3)(B).

80. It is desirable and efficient to concentrate litigation of the claims in this jurisdiction because plaintiffs are Oregon citizens, defendants regularly conduct business in Oregon by selling long-term care insurance policies to Oregon citizens, and the bulk the alleged wrongdoing, and all of the damage, occurred in Oregon. Fed. R. Civ. P. 23(b)(3)(C).

81. Judicial administration of this case is manageable. Fed. R. Civ. P. 23(b)(3)(D).

## FIRST CLAIM FOR RELIEF

### (Elder Abuse Pursuant to ORS § 124 et seq.)

82. Plaintiffs reallege all previous paragraphs.

83. Plaintiff Lorraine Bates was born on January 2, 1926.

84. Plaintiff Charles Ehrman Bates was born on November 27, 1925.

85. Plaintiff Eileen Burk was born on August 28, 1922.

86. At all relevant times, plaintiffs Lorraine Bates, Charles Ehrman Bates and Eileen Burk were at least sixty-five years old, and therefore, were "elderly" and "vulnerable" as those terms are defined in ORS § 124.100(1).

87. Defendants sold plaintiffs Lorraine Bates and Charles Ehrman Bates a Bankers Life long-term care insurance policy in 1998. Defendants sold plaintiff Eileen Burk a Bankers Life long-term care insurance policy in 1995.

88. As set forth in paragraphs 27-41 above, defendants wrongfully refused to honor plaintiff Lorraine Bates's application for benefits for the cost of assisted living care provided by Janet's Adult Foster Home. Defendants' conduct was wrongful because their stated reason for

denying plaintiffs' claim was both baseless and contrary to the very terms and definitions of the Bankers Life policy held by plaintiffs.

89.    As set forth in paragraphs 43 through 60 above, defendants wrongfully refused to honor plaintiff Eileen Burk's claim for benefits for the cost of assisted living care provided by River Valley Landing between January 29, 2009 and March 30, 2009.  Defendants' conduct was wrongful because it was contrary to the express terms of the Bankers Life Policy, which provided for a 30-day elimination period, not a 93-day elimination period.

90.    Defendants are liable for financial abuse of a vulnerable person, as provided by ORS § 124.100 and 124.110 in the following ways:

a)    Defendants sold the policies to plaintiffs without disclosing that they would unilaterally increase the premiums without increasing the level of long-term care benefits commensurate with the rise in health care costs;

b)    Defendants took money from plaintiffs in the form of premium payments, while having no intention of honoring its obligations under the express terms of the insurance contracts entered between Bankers Life and plaintiffs;

c)    Defendants, without good cause, denied plaintiffs claims for long-term care benefits, even thought defendants knew or should have known that plaintiffs were entitled to those benefits under the express terms of the policies;

91.    As a result of defendants' actions, plaintiffs have suffered economic damages in the form of unreimbursed health care costs, as well as expenses incurred from pursuing their claims for benefits, as described herein.

92.    Plaintiffs have and will incur attorney's fees in the prosecution of action and are therefore entitled to reasonable attorney's fees under ORS 124.100(1)(c).

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

### Count 1:  Breach of Covenant of Good Faith and Fair Dealing

93.    Plaintiffs reallege all previous paragraphs.

94.     Defendants entered into promises with plaintiffs to provide long-term care insurance benefits in exchange for the payment of premiums.  The parties agreed on the essential terms, as reflected in the insurance contracts.  Defendants, as a party to these agreements, had a duty to act in good faith in performing and enforcing them.

95.     Defendants failed to perform as required by the contracts, and breached the duty owed to plaintiffs of good faith and fair dealing implicit in those contracts, by refusing to pay benefits in full, as alleged in paragraphs 27 through 60.

96.     By not acting in good faith, defendants failed to meet the reasonable expectations they gave plaintiffs when the contracts were formed.  Defendants failed to pay, or unreasonably delayed payment for the long-term care services reasonably incurred by plaintiffs, all to the damage of plaintiffs as alleged in paragraphs 27 through 60.

## Count 2:  Breach of Promises

97.     Plaintiffs reallege all previous paragraphs.

98.     Plaintiffs have performed all of their obligations under their Bankers Life long-term care insurance contracts.  As alleged above, plaintiffs Lorraine Bates, Charles Ehrman Bates and Eileen Burk made their premium payments on time.  They were never in default and did not engage in any acts or omissions that would have voided the contract.

99.     Defendants did not perform their obligations in full.  Defendants failed to pay, or unreasonably delayed payment of benefits promised to plaintiffs.  Defendants' breaches of these contracts caused plaintiffs to suffer significant economic damages that arose naturally and necessarily from those breaches, as described above in paragraphs 27 through 60.

## THIRD CLAIM FOR RELIEF

### (Fraud)

100.    Plaintiffs reallege all previous paragraphs.

101.    Defendants induced plaintiffs into entering into their Bankers Life long-term care policies based on false representations made by defendants James D. Peterson and John Doe defendants.

315252v1

102.    Defendants made representations to induce plaintiffs to purchase Bankers Life insurance policies.  Defendants knowingly led plaintiffs to believe the following:

a)      plaintiffs' claims would be paid according to the provisions in the Bankers Life policies;

b)      plaintiffs' claims would be paid without delay;

c)      plaintiffs' claims would be paid in full;

d)      the level of benefits payable to plaintiffs would not be reduced;

e)      the premiums they paid would be affordable, and the benefits they received would cover reasonable healthcare expenses.

103.    At the time plaintiffs entered into their insurance contracts, defendants knew these statements were both false and material.  Defendants made these statements knowing that plaintiffs would rely on them.  In fact, by making false and material misrepresentations to plaintiffs, defendants convinced plaintiffs to purchase their Bankers Life policies.

104.    Defendants knowingly omitted to disclose the following material information from plaintiffs to induce them to purchase their Bankers Life policies:

a)      Bankers Life intended, as a matter of course, to ignore plaintiffs' telephone calls and correspondence requesting payments of benefits to which they were entitled;

b)      Bankers Life intended, as a matter of course, to deny plaintiffs' claims under the false pretense that their care providers did not meet policy requirements;

c)      Bankers Life intended, as a matter of course, to delay payment of plaintiffs' claims until forced to do so under the threat of governmental or legal action;

d)      Bankers Life intended, as a matter of course, to pay less than the full value of the claims;

e) Bankers Life intended, as a matter of course, to increase plaintiffs' premiums every year, even before plaintiffs made a single claim, and without increasing the level of benefits provided.

105. Defendants knew these omissions were material at the time they were not disclosed. Defendants knew that by not disclosing the information, plaintiffs would be induced to purchase Bankers Life policies that they otherwise would not have bought had they been aware of the omissions.

106. Plaintiffs relied on the above representations when they purchased the policies and would not have entered into their long-term care insurance policies with defendants had they been aware of defendants' misrepresentations and omissions.

107. Plaintiffs had a right to rely on defendants' representations and promises to perform in accordance with the provisions of the insurance contract.

108. As a result of their reliance on defendants' representations and omissions, plaintiffs have incurred significant economic damages in the form of premiums paid, as alleged in paragraphs 40, 41, 58, 59 and 60 above, not including expenses they incurred in obtaining legal counsel to represent them. Plaintiffs will continue to incur additional economic damages as they continue to pay premiums to defendants.

109. As a result of defendants' misrepresentations and omissions, plaintiffs have also incurred significant economic damages in the form of claims that were either denied, or not paid in full, as alleged in paragraphs 40, 41, 58, 59 and 60 above.

### FOURTH CLAIM FOR RELIEF

**(Negligence – against Insurance Company Defendants)**

110. Plaintiffs reallege all previous paragraphs.

111. Defendants are large, national insurance corporations in the business of selling long-term care insurance policies to consumers, including Oregon.

112. To do business in Oregon, defendants must comply with minimum standards of care to avoid engaging in unfair claim settlement practices. Among other things, defendants

315252v1

must not misrepresent facts or policy provisions, delay in responding to claim inquiries, refuse to pay claims without conducting a reasonable investigation based on all available information. Defendants must adopt and implement reasonable standards for the prompt investigation of claims and must make good faith efforts to promptly and equitably settle legitimate claims. Defendants must not force claimants to initiate litigation to recover benefits, nor must they attempt to settle claims for less than amounts to which policy holders are entitled.

113. Because defendants are licensed in Oregon, and because they advertise their services as "focused exclusively on the needs of senior Americans," it was foreseeable to defendants that their failure to comply with these minimum standards of care could cause significant economic harm to elderly policy holders and their families.

114. Defendants failed to exercise the care of an ordinarily prudent insurer because they had no reasonable standards in place to handle claim applications in a competent, efficient and ethical manner. Specifically:

> (A) Defendants lacked internal policies or procedures to make sure that their employees promptly returned telephone calls or followed up in writing to respond to policy holders' claims for benefits;
>
> (B) Defendants lacked internal policies or procedures to properly organize, maintain and store claim applications submitted by policy holders, including medical records and other supporting documents;
>
> (C) Defendants did not properly supervise, train and instruct employees reviewing applications for long-term benefit claims to make sure they did not deny insurance claims for improper or undocumented reasons.

115. Instead, defendants fostered a culture of indifference and incompetence, which manifested itself in the following ways:

> (A) Defendants routinely lost claim forms and paperwork submitted by policy holders;

315252v1

(B)     Employees were instructed not to cooperate with one another or to contact policy holders by telephone when claims were denied;

(C)     Employees were instructed to deny claims whenever possible.

116.    As a direct result of defendants' negligence and incompetence in managing claims, plaintiffs' applications for benefits were delayed and/or denied in full or in part. Plaintiffs suffered economic damages as a consequence.

## FIFTH CLAIM FOR RELIEF
### (Intentional Misconduct)

117.    Plaintiffs reallege all previous paragraphs.

118.    The State of Oregon considers elderly people to be financially vulnerable.  It is in the public interest to safeguard and enhance the physical and financial welfare of elderly persons, including plaintiffs.

119.    At all relevant timeframes, plaintiffs were both elderly and financial vulnerable. Specifically, they were vulnerable in that:

a)      Plaintiffs were living on fixed retirement incomes, which limit their ability and flexibility to absorb the rising costs of healthcare;

b)      Sooner or later, elderly people, including plaintiffs, will require assisted living services, whether at home or in a assisted living facility or nursing home;

c)      Without insurance, the costs of assisted living are significant and could potentially drain the assets of plaintiffs and their families;

d)      To avoid financial ruin to themselves and their families, plaintiffs took out long-term care insurance premiums at an annual cost of at least $1,500 per year (not including regular premium rate hikes).  Plaintiffs paid tens of thousands of dollars for these policies over a span of 10 or more years, before making a single claim for benefits;

315252v1

e)      Defendants were aware of the financial vulnerability elderly people face because they advertised their Bankers Life polices as a safe and dependable way to provide for people when they could no longer take care of themselves;

f)      Plaintiffs relinquished control over their money to defendants, expecting they would pay plaintiffs' claims promptly and provide the level of healthcare promised to them if and when the need arose.

120.    In light of plaintiffs' financial vulnerability, defendants had a special relationship with plaintiffs, which gave rise to a heightened duty to protect plaintiffs' financial interests and welfare.  This duty required defendants to pay plaintiffs' claims promptly and in full.

121.    Defendants intentionally breached their duty of care in the following ways:

a)      Defendants deliberately ignored plaintiffs' requests for benefits and delayed in responding to repeated telephone calls and correspondence;

b)      Defendants deliberately delayed payment of plaintiffs' claims;

c)      Defendants either refused to pay plaintiffs' claims in full or denied paying them altogether;

d)      Defendants deliberately increased plaintiffs' insurance premiums without increasing the level of benefits commensurately with the rising costs of healthcare;

122.    Defendants knew that the above breaches would have a devastating impact on plaintiffs' health and financial welfare;

123.    Defendants' consistent pattern of delaying claims, denying claims and/or not paying claims in full, and increasing plaintiffs' insurance premiums while pocketing the extra revenue reflects reckless, outrageous and malicious disregard for the health, safety and welfare of plaintiffs.

124.    As a result of defendants' conduct, plaintiffs are entitled to economic damages, as well as punitive or exemplary damages.

125.    Plaintiff requests trial by jury.

WHEREFORE, plaintiffs, on behalf of themselves and the class of members they seek to represent, request the following relief:

A.    An Order declaring this action to be certified as a class action pursuant to Fed. R. Civ. P. 23, establishing an appropriate class, subclasses, or issue classes, and finding that plaintiffs are appropriate representatives for each class;

B.    Economic damages in a reasonable amount to be determined by a jury, including full payment of benefits owed to class members, reimbursement for expenses incurred in attempting to obtain their benefits, and repayment of premiums, to class members who have not made claims for long-term care benefits and seek rescission of their insurance contracts;

C.    Punitive and/or exemplary damages;

D.    An award of costs and expenses in this litigation, including, but not limited to, reasonable attorneys' fees; and

E.    Such other relief as may be just and proper.

Dated:  April 4, 2013.

WILLIAMS LOVE O'LEARY & POWERS, P.C.

By: s/ Leslie W. O'Leary
        Leslie W. O'Leary, OSB No. 990908
        Michael L. Williams, OSB No. 784260
        Thomas B. Powers, OSB No. 983933
        Steven B. Seal, OSB No. 085384
        WILLIAMS LOVE O'LEARY & POWERS, P.C.
        12725 S.W. Millikan Way, Suite 300
        Beaverton, OR 97005
        Telephone: (503) 295-2924
        Facsimile: (503) 295-3720

        Christopher L. Cauble, Esq., OSB No. 962374
        Rachele R. Selvig, Esq., OSB No. 095016
        CAUBLE & CAUBLE, LLP
        111 SE Sixth St.
        Grants Pass, OR 97526
        Telephone: (541) 476-8825
        Facsimile: (541) 471-1704

        Attorneys for Plaintiffs

315252v1