IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LORRAINE BATES, CHARLES EHRMAN
BATES, EILEEN BURK, DAVD
YOUNGBLUTH, DOLORES MARIER,
THOMAS MARIER, DAVID CASTAGNO,
and DARLA CASTAGNO,

        Plaintiffs,

                                      3:13-CV-580-PK

v.                                    OPINION AND
                                    ORDER

BANKERS LIFE AND CASUALTY
COMPANY and CNO FINANCIAL GROUP,
INC.,

        Defendants.

PAPAK, Magistrate Judge:

        Named plaintiffs Eileen Burk, David Youngbluth, Charles Ehrman Bates, and Lorraine

Bates filed this putative class action against their insurer Bankers Life and Casualty Company

("Bankers"), Bankers' intermediate and ultimate parent companies CDOC, Inc. ("CDOC"), and

CNO Financial Group, Inc. ("CNOFG"), individual defendant James Peterson, and ten corporate

Doe defendants on April 4, 2013. On May 31, 2013, plaintiffs amended their complaint, abandoning their claims against Peterson and the corporate Doe defendants, adding Bankers' intermediate parent company Conesco Life Insurance Company of Texas ("CLIC") as an additional defendant, and adding David Castagno, Darla Castagno, Thomas Marier, and Dolores Marier as additional named plaintiffs. Effective October 23, 2013, plaintiffs amended their complaint a second time, abandoning their claims against Bankers' intermediate parent companies CDOC and CLIC. The parties' dispute arises out of the remaining defendants' alleged conduct in connection with the issuance of long-term health-care insurance policies to the plaintiffs, with raising plaintiffs' insurance premiums owed under those policies without commensurate increase in the benefits available thereunder, and with the handling and disposition of claims filed under the policies. By and through their second amended complaint, plaintiffs allege Bankers' and CNOFG's liability for elder abuse in violation of Oregon statutory law, breach of contract and of the implied covenant of fair dealing, fraudulent inducement to enter into the subject insurance agreements, and a tort styled as "intentional misconduct." Plaintiffs argue both that CNOFG may be found directly liable on each of their claims and, alternatively, that CNOFG may be found vicariously liable on their claims either on an alter ego or an agency theory. This court has subject-matter jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and the amount in controversy.

Now before the court are CNOFG's motion (#29) to dismiss for failure to state a claim and for lack of personal jurisdiction,[1] defendants' motion (#32) to strike plaintiffs' class action

---

[1] CNOFG's motion was initially brought by CLIC and CDOC as well as by CNOFG. In consequence of plaintiffs' abandonment of their claims against CLIC and CDOC, I construe the motion as though brought only on behalf of CNOFG, and do not analyze the parties' arguments to

allegations from their pleading, and defendants' motion (#39) to dismiss plaintiffs' elder abuse,

fraud, and intentional misconduct claims in their entirety and to dismiss plaintiffs' breach claim

in part.  I have considered the motions, oral argument on behalf of the parties, and all of the

pleadings and papers on file.  For the reasons set forth below, CNOFG's motion (#29) to dismiss

is granted on personal jurisdictional grounds as to plaintiffs' fraud in the inducement claim to the

extent alleged against CNOFG, and otherwise denied (in part as moot and in part on its merits, as

discussed below), defendants' motion (#32) to strike class allegations is granted, and defendants'

motion (#39) to dismiss is granted with prejudice as to plaintiffs' elder abuse and intentional

misconduct claims in their entirety, with prejudice as to plaintiffs' fraud claim to the extent

premised on a theory of fraudulent inducement to continue paying policy premiums pursuant to

pre-existing insurance contracts, without prejudice as to plaintiffs' fraud claim to the extent

premised on a theory of fraudulent inducement to enter into the insurance policies in the first

instance, with prejudice as to the breach claims brought by the Castagno plaintiffs in their

entirety and as to the breach claims brought by plaintiffs Charles Ehrman Bates and Dolores

Marier to the extent premised solely on those plaintiffs' concern regarding possible future breach,

and with prejudice as to the breach claims brought by plaintiffs Charles Ehrman Bates, David

Youngbluth, and Dolores Marier to the extent brought on those plaintiffs' own behalf rather than

on behalf of those plaintiffs' family members who sought benefits under their Bankers policies,

and is otherwise denied.

_____

the extent they pertain only to CLIC and/or CDOC.

## LEGAL STANDARDS

**I.      Motion to Dismiss for Lack of Personal Jurisdiction**

A motion to dismiss for lack of personal jurisdiction is governed by Federal Civil Procedure Rule 12(b)(2).  *See* Fed. R. Civ. P. 12(b)(2).  "In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper."  *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008), *citing Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).  In evaluating the defendant's motion, "[t]he court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues."  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001), *citing Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). If the court decides the motion based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, "the plaintiff need make only a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss."  *Id.*, *quoting Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  In the absence of such an evidentiary hearing, the court accepts uncontroverted allegations contained within the plaintiff's complaint as true, and resolves conflicts between statements contained within the parties' affidavits in the plaintiff's favor.  *See id.*

**II.     Motion to Dismiss for Failure to State a Claim**

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To raise a right to relief above the

speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.*, *quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R. Civ. P. 8(a).  Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009), *citing Iqbal*, 129 S. Ct. at 1949.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).  In considering a motion to dismiss, this court accepts all of the allegations in the complaint as true and construes them in the light most favorable to the plaintiff.  *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007).  Moreover, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court need not, however, accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## III.   Motion to Strike Class Allegations

In conducting an action under [Federal Civil Procedure Rule 23], the court may issue

orders that:

          * * *

    (D)    require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

    (E)    deal with similar procedural matters.

Fed. R. Civ. P. 23(d).

## FACTUAL BACKGROUND

### I.    The Parties

#### A.    Defendants

Defendant Bankers is a Delaware corporation with its principal place of business in Illinois, engaged in the business of issuing and selling insurance policies, including elder disability care and long-term health-care policies such as those purchased from it by some of the named plaintiffs.  Bankers is a wholly-owned indirect corporate subsidiary of defendant CNOFG.

CNOFG is a Delaware corporation with its principal place of business in Delaware. Plaintiffs allege that CNOFG (and/or its immediate corporate predecessor entity) at all material times oversaw Bankers' activities in marketing long-term health-care policies to older Oregonians, and played a direct role in reviewing and processing claims filed under such policies.  Plaintiffs further allege that in the ordinary course of business CNOFG exercises "day-to-day management and control over Bankers," including by providing all human resources, public relations, legal affairs, product development, and employee training services and functionality to Bankers.  Moreover, plaintiffs allege that it was William Kirsch, the CEO of CNOFG, who in 2005 was the architect of the policies and procedures complained of here, and

who specifically and expressly required Bankers to begin denying legitimate claims under Bankers' long-term health-care policies and to create obstacles intentionally calculated to make filing such claims more burdensome for Bankers' insureds.

### B.    Plaintiffs

Each of the named plaintiffs, like the members of the proposed classes the named plaintiffs purportedly represent, is (and at all material times was) an individual resident of Oregon.  Each of the named plaintiffs other than Youngbluth, who is the son of named plaintiff Eileen Burk, was issued a long-term health-care insurance policy by Bankers.

As discussed in greater detail below, the Bateses (Charles Ehrman Bates and Lorraine Bates), the Burk family (Eileen Burk and her uninsured son David Youngbluth), and the Mariers (Thomas Marier and Dolores Marier) each allegedly pursued a claim or claims under their respective policies with only partial success, and allege that Bankers has both failed to pay certain covered expenses and breached their insurance contract in other ways, including by intentionally delaying payments and by failing to waive further premiums as provided under the policy.  Specifically, the Bateses allegedly pursued a claim for benefits on behalf of Lorraine Bates, the Burk family allegedly pursued a claim for benefits on behalf of Eileen Burk, and the Mariers allegedly pursued a claim for benefits on behalf of Thomas Marier.

The Castagnos (David Castagno and Darla Castagno), by contrast, have never attempted to file a claim under their policy, but rather are concerned that should they need to avail themselves of the coverage they believed they were promised when they purchased the policy, Bankers will delay payment, deny coverage in whole or in part, and otherwise breach their agreement in the same manner as it allegedly did in connection with the claims filed on behalf of

Page 7 - OPINION AND ORDER

Lorraine Bates, Eileen Burk, and Thomas Marier.

The plaintiffs propose three classes of absent plaintiffs purportedly similarly situated to the named plaintiffs: (i) Oregonian policy-holders whose claims have been mishandled by Bankers through a combination of delay and nonpayment of claims between 2005 and the present, notwithstanding the insureds' timely payment of all policy premiums (plaintiffs' "Class A," putatively represented by Lorraine Bates, Eileen Burk, and Thomas Marier), (ii) family members and other representatives of such Oregonian policy-holders who have incurred expenses in the course of attempting to obtain benefits for their policy-holder family members under their policies (plaintiffs' "Class B," putatively represented by Charles Ehrman Bates, David Youngbluth, and Dolores Marier), and (iii) Oregonian policy-holders who have paid all policy premiums on a timely basis and who have not yet filed any claim under their policies (plaintiffs' "Class C," putatively represented by Charles Ehrman Bates, Dolores Marier, David Castagno, and Darla Castagno).

## II.      History of the Parties' Dispute[2]

Bankers is in the business of selling annuities and elder disability care insurance policies to older Oregonians. Bankers aggressively marketed long-term health-care insurance policies to this demographic despite its awareness, by not later than 2005, that it would be unable to comply with its obligations under those policies due to rising health care costs and due to increased projected longevity among its insured population. At the time of sale of such a policy, Bankers would advise purchasers to "review carefully all policy limitations," but would provide neither a

_____

[2] Except where otherwise indicated, the following recitation constitutes my construal of the allegations of plaintiffs' second amended complaint in the light most favorable to plaintiffs.

copy of the policy itself nor a summary of all applicable limitations, but rather only a misleading

summary of select policy provisions.

In addition, defendants "developed onerous procedures" calculated to discourage policy-

holders from pursuing valid claims for insurance benefits under the policies and to delay and

deny such claims improperly, including the following:

(A)    [Bankers'] [e]mployees were prohibited from responding to policy holders
       by telephone;

(B)    Defendants abandoned or denied claims without notifying policy holders;

(C)    Defendants routinely lost claim forms, medical records and other
       documentation provided by plaintiffs;

(D)    Employees were not allowed to contact one another to resolve disputes
       about claims;

(E)    Defendants denied claims because of missing records, even though such
       records had been provided to them, sometimes repeatedly;

(F)    Defendants systematically denied claims on the false grounds that the
       policy-holder's elder disability care providers were not "licensed" or
       otherwise did not comply with the policy requirements, even though
       Oregon law does not require care givers to be licensed;

(G)    Defendants routinely paid less than what the claimants were owed under
       the terms of their policies; [and]

(H)    Defendants would demand that policy holders continue paying premiums
       even though the policies' "waiver" provision suspended premiums while
       policy holders or their spouses received benefits.

Second Amended Complaint, ¶ 37.

Charles Ehrman and Lorraine Bates purchased a long-term health-care policy from

Bankers (Policy No. 980,155,343 or the "Bates policy") on or around June 30, 1998.  In

December 2009, Lorraine Bates moved into an elder care facility, and her husband Charles

Page 9 - OPINION AND ORDER

Ehrman Bates submitted a claim to Bankers on her behalf, seeking reimbursement of the costs thereby incurred.  In September 2010, Bankers denied coverage on spurious grounds.  Shortly thereafter, the Bateses retained the services of an attorney who pursued their claim against Bankers.  In June 2011, Bankers agreed to pay the Bates' claim retroactively to July 9, 2010, but refused to cover the Bates' expenses incurred between December 2009 and July 2010.  The Bateses continue to pay premiums under their Bankers policy, notwithstanding policy provisions that waive premiums following 90 consecutive days of benefits paid under the policy.

Elieen Burk purchased a long-term health-care policy from Bankers (Policy No. 950,193,392 or the "Burk policy") on or around July 27, 1995.  In December 2008, Burk moved into an assisted living facility, and her son Youngbluth attempted to submit a claim to Bankers on her behalf, seeking reimbursement of the costs thereby incurred.  Youngbluth was unsuccessful in his efforts to submit the claim, due to the failure of Bankers' employees and of the insurance agent who initially sold the policy to Burk to assist him or to respond to his inquiries.  Youngbluth retained counsel to assist him, and his attorney ultimately submitted Burk's claim with supporting materials in April 2009.  In May 2009, Bankers agreed to pay the claim retroactively to March 31, 2009, but failed to reimburse 63 days of covered expenses notwithstanding its concession that coverage existed during the material period.  In December 2009, Bankers agreed to waive further premium payments under the policy retroactively to August 2009, although according to the terms of the policy such waiver should have taken effect as of April 2009.  The Burk family's counsel requested a copy of the policy from Bankers, but in response Bankers provided only a summary of the policy.  In May 2012, Bankers advised Burk that she had exhausted the benefits available under her policy, and ceased paying further benefits.

Page 10 - OPINION AND ORDER

In addition, because no further benefits were to be paid, Bankers rescinded its waiver of Burk's policy premiums, and demanded that she resume paying premiums notwithstanding its position that no further benefits were available whether premiums were paid or not.

Thomas and Dolores Marier purchased a long-term health-care policy from Bankers (Policy No. 940,143,808 or the "Marier policy") on or around April 1, 1994.  Thomas Marier received home health-care services for nine months from February 16, 2011, through November 24, 2011, and in February 2011 his wife Dolores Marier submitted a claim to Bankers on his behalf, seeking reimbursement of the costs thereby incurred.  In April 2011, Bankers denied the claim on the spurious ground that the Marier policy did not pay for the first 30 days of home health care, whereas in fact the policy excluded coverage only for the first 14 days of home health care.  In May 2011 Dolores Marier pointed out the error, and in August 2011 Bankers acknowledged its mistake and paid $840 of the $865 it owed for the first 16 covered days of Thomas Marier's home health care (without explanation for its failure to pay the full covered amount).  In December 2011, Bankers characterized its payment of $840 as an overpayment, again citing the spurious 30-day exclusion invoked in connection with the initial denial, and demanded that the Mariers return the funds.  The Mariers complied, out of concern that Bankers would otherwise void the policy in its entirety.  Dolores Marier filed a complaint with the Oregon Insurance Division in March 2013, and in response to the complaint Bankers advised the agency that it had paid the claim, without acknowledging that its payment had been returned.

In November 2011, Thomas Marier moved into a nursing home, and Bankers began paying benefits 30 days thereafter.  Thomas Marier remained in the nursing home until January 2012, when he was hospitalized until February 2012.  In February 2012, Thomas Marier moved

Page 11 - OPINION AND ORDER

into a new nursing home that specialized in caring for residents with his condition.  In December 2012, Bankers agreed to waive the Mariers' premium payments, which according to the Marier policy became waived after 90 days of consecutive benefits, retroactively to June 2012, on the purported ground that the hospitalization of early 2012 constituted an interruption in the care Thomas Maurier had been receiving.  Dolores Marier again complained to the Oregon Insurance Division, and Bankers refunded the remaining waived premiums.

In October 2012, Thomas Marier moved to Oregon State Hospital, the only Oregon facility then willing to accept him as an inpatient given his condition.  Bankers has refused to cover any of the costs thereby incurred, notwithstanding Thomas Marier's continued eligibility for coverage under the policy.  Because Bankers stopped paying benefits, it additionally ceased waiving the Mariers' premiums.

David and Darla Castagno purchased a long-term health-care policy from Bankers (Policy No. 950,189,898 or the "Castagno policy") on or around July 31, 1995. They have timely paid all premiums under the policy, but have never made a claim under it.

According to defendants' evidentiary submissions, the Bates policy, the Burk policy, the Marier policy, the Castagno policy and all policies issued by Bankers to members of putative Class A and Class C all expressly provide that "[n]o legal action may be brought to recover on this policy . . . . after 3 years . . . from the time written proof of loss is required to be given." Except where it is not reasonably possible for an insured to do so, the policies provide that written proof of loss must be submitted "within 90 days after the end of each period" for periodic payment of a continuing loss and "within 90 days of the end of [any other] loss."  In the event it is not reasonably possible to submit written proof of loss within the specified time, the policies

provide that insureds may do so within a period of up to one year.

## ANALYSIS

As noted above, by and through its motion (#29) to dismiss, defendant CNOFG moves pursuant to Federal Civil Procedure Rule 12(b)(2) for dismissal of plaintiffs' claims against it for lack of personal jurisdiction, and in the alternative moves for dismissal of plaintiffs' claims for failure to state a claim upon which relief can be granted pursuant to Federal Civil Procedure Rule 12(b)(6), on the narrow ground that plaintiffs have failed adequately to allege CNOFG's involvement in and/or vicarious responsibility for the conduct complained of in plaintiffs' complaint. In addition, by and through their motion (#39) to dismiss, defendants Bankers and CNOFG together challenge the broader adequacy of plaintiffs' allegations to support their claims under Rule 12(b)(6). In the discussion that follows, I address first the jurisdictional issues raised by CNOFG's motion and then, following analysis of defendants' motion (#32) to strike class allegations, combine discussion and analysis of the issues raised by CNOFG's Rule 12(b)(6) arguments and defendants' Rule 12(b)(6) motion.

## I.    CNOFG's Motion (#29) to Dismiss for Lack of Personal Jurisdiction

By and through its motion (#29) to dismiss, CNOFG argues that plaintiffs' claims against it should be dismissed for lack of personal jurisdiction. For the reasons set forth below, CNOFG's motion to dismiss for lack of personal jurisdiction is granted without prejudice as to plaintiffs' fraud in the inducement claim to the extent alleged against CNOFG only, and otherwise denied.

"When no federal statute governs personal jurisdiction, the district court applies the law of the forum state." *Boschetto*, 539 F.3d at 1015, *citing Panavision Int'l L.P. v. Toeppen*, 141

Page 13 - OPINION AND ORDER

F.3d 1316, 1320 (9th Cir. 1998).  Oregon's long-arm statute creates a standard co-extensive with federal jurisdictional standards, *see* Or. R. Civ. P. 4L, so a federal court sitting in the District of Oregon may exercise personal jurisdiction wherever it is possible to do so within the limits of federal constitutional due process, *see*, *e.g.*, *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990).

Federal due process jurisprudence requires that, to be subject to the personal jurisdiction of a federal court, a nonresident defendant must have at least "'minimum contacts'" with the court's forum state such that "the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004), *quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Two forms of personal jurisdiction are available for application to a nonresident defendant:  general personal jurisdiction and specific personal jurisdiction.

## A.    General Personal Jurisdiction

"For general jurisdiction to exist over a nonresident defendant . . . , the defendant must engage in continuous and systematic general business contacts . . . that approximate physical presence in the forum state."  *Schwarzenegger*, 374 F.3d at 801, *quoting Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) and *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000).  "This is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world."  *Id.*, *citing Brand v. Menlove*

*Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986). Here, plaintiffs do not argue that this court could

properly exercise general personal jurisdiction over any of the defendants, and it is in any event

clear that this court may not do so over CNOFG in that CNOFG is neither headquartered nor

incorporated in Oregon, and does not have such continuous and systematic contacts with Oregon

"as to render it essentially at home" in this district. *Daimler AG v. Bauman*, Case No. 11-965,

2014 U.S. LEXIS 644, *41 (U.S. Jan. 14, 2014), *quoting Goodyear Dunlop Tires Operations,*

*S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011), *citing International Shoe*, 326 U.S. at 317 (internal

modifications omitted); *see also id.* at *38-43. In consequence, plaintiffs' claims cannot survive

CNOFG's motion on a theory of general personal jurisdiction.

### B.    Specific Personal Jurisdiction

The courts of the Ninth Circuit apply a three-pronged test for determining whether, in

connection with a given claim, the exercise of specific personal jurisdiction over a nonresident

defendant is appropriate:

> (1) The non-resident defendant must purposefully direct his activities or
> consummate some transaction with the forum or resident thereof; or perform some
> act by which he purposefully avails himself of the privilege of conducting
> activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's
> forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice,
> *i.e.* it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802, *quoting Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987).

The plaintiff bears the burden of satisfying the first two prongs of the test, whereupon the burden

shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not

Page 15 - OPINION AND ORDER

be reasonable." *Id.*, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).

In the context of cases that sound primarily in tort, courts have considered it sufficient to satisfy the first prong of the test where the only contact a nonresident defendant had with the forum state was "the 'purposeful direction' of a *foreign* act having *effect* in the forum state." *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986) (emphasis original), *citing Calder v. Jones*, 465 U.S. 783, 789 (1984).  This "'effects' test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).  "The requirement is but a test for determining the more fundamental issue of whether a 'defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.'" *Id.*, *quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082 (9th Cir. 2000), the Ninth Circuit discussed the "express aiming" prong of the effects test as follows:

> In *Calder*, the Supreme Court held that a foreign act that is both aimed at and has effect in the forum state satisfies the purposeful availment prong of the specific jurisdiction analysis.  To meet the effects test, the defendant must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state.  *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998).  Subsequent cases have struggled somewhat with *Calder*'s import, recognizing that **the case cannot stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction**.  We have said that there must be "something more," but have not spelled out what that something must be. *See Panavision*, 141 F.3d at 1322.
>
> **We now conclude that "something more" is what the Supreme Court described as "express aiming" at the forum state.**  *See Calder*, 465 U.S. at 789.

Page 16 - OPINION AND ORDER

Express aiming is a concept that in the jurisdictional context hardly defines itself. From the available cases, we deduce that **the requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state**. For example, in *Calder* itself, the defendants were a reporter and an editor of a nationally-circulated tabloid newspaper whom plaintiff, a well-known California resident, accused of libel. The defendants argued that the alleged wrong had no intended nexus with California and that they should be treated like "a welder employed in Florida who works on a boiler which subsequently explodes in California." *Id.* The Supreme Court rejected this proposed analogy, pointing out that "petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California." *Id.*

Subsequent cases from this circuit bear out the conclusion that "express aiming" encompasses wrongful conduct individually targeting a known forum resident. In *Metropolitan Life Insurance Co. v. Neaves*, 912 F.2d 1062 (9th Cir. 1990), we held that an Alabama resident could be haled into a California court on the basis of a letter she sent to an insurance company representing that she was entitled to an insurance payment that actually belonged to a California resident. We stated that under *Calder*, it was irrelevant where the letter was sent. The critical factor was that in sending the letter, the defendant "was purposefully defrauding [plaintiff] in California." 912 F.2d at 1065. Similarly, in *Brainerd v. Governors of the University of Alberta*, 873 F.2d 1257 (9th Cir. 1989), we held that an Arizona court could exercise specific jurisdiction over Canadian residents who, in response to telephone calls directed to them in Canada, made statements that allegedly defamed a person they knew resided in Arizona. *Id.* at 1259-60. Even though the Canadian defendants had not initiated the telephone calls, the statements they made about the plaintiff during the conversations were not "untargeted negligence" but rather were "performed for the very purpose of having their consequences felt in the forum state." *Id. See also Gordy v. Daily News, L.P.*, 95 F.3d 829, 833 (9th Cir. 1996) (holding that specific jurisdiction existed in light of evidence of "targeting" of the plaintiff, who was a forum resident); *Lake v. Lake*, 817 F.2d 1416, 1422-23 (9th Cir. 1987) (holding that specific jurisdiction existed where defendant performed foreign acts for the purpose of having their consequences felt in the forum state); *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1398 (9th Cir. 1986) (finding purposeful availment where forum effect of a foreign act "was not only foreseeable, it was contemplated and bargained for").

The presence of individualized targeting is what separates these cases from others in which we have found the effects test unsatisfied. In *Cybersell*, [*Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir. 1997),] for example, there was no showing

that the defendants even knew of the existence of the plaintiffs, let alone targeted them individually. *See* 130 F.3d at 420. *See also Gordy*, 95 F.3d at 833 (distinguishing certain cases holding that no personal jurisdiction existed under *Calder* on the ground that in those cases targeting was lacking).

*Bancroft & Masters*, 223 F.3d at 1087-1088 (emphasis supplied; modifications original).

The second prong of the specific personal jurisdiction test requires that the plaintiff's claim arise out of the nonresident defendant's forum-related activities. *See Boschetto*, 539 F.3d at 1016. Moreover, it has long been settled law in the Ninth Circuit that "[w]here. . . a plaintiff raises two [or more] separate causes of action, the court must have in personam jurisdiction over the defendant with respect to each claim." *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1289, n. 8 (9th Cir. 1977), *citing* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1588, at p. 816 (1971).

At the third prong of the specific personal jurisdiction test, the burden shifts to the defendant to present a "compelling case" to rebut the presumption that the exercise of specific personal jurisdiction would be reasonable. *See id.*

In determining reasonableness, th[e] [courts of the Ninth] circuit examine[] seven factors: the extent of purposeful interjection; the burden on the defendant to defend the suit in the chosen forum; the extent of conflict with the sovereignty of the defendant's state; the forum state's interest in the dispute; the most efficient forum for judicial resolution of the dispute; the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and the existence of an alternative forum.

*Shute v. Carnival Cruise Lines*, 897 F.2d 377, 386 (9th Cir. 1990), *citing Federal Deposit Ins. Corp. v. British-American Ins. Co., Ltd.*, 828 F.2d 1439, 1442 (9th Cir. 1987). "The court[s] must balance the seven factors to determine whether the exercise of jurisdiction would be reasonable." *Id.*, *citing British-American*, 828 F.2d at 1442.

Page 18 - OPINION AND ORDER

As noted above, plaintiffs allege that CNOFG both oversaw Bankers' activities in marketing long-term health-care policies to older Oregonians and played a direct role in some of the conduct plaintiffs complain of in this action, including by reviewing and processing claims filed by Bankers' insureds under the long-term health-care policies at issue here and by expressly instructing Bankers to deny or delay payment of benefits on legitimate claims filed under those policies, beginning in or around 2005. While mere oversight of marketing activities cannot meet the "purposeful direction" prong of the specific personal jurisdiction test, in that such oversight cannot properly be characterized as having been "directed" at Oregon and did not in any event have independent effects in Oregon beyond the consequences of the overseen conduct itself, by contrast CNOFG's alleged role in reviewing and processing (and in improperly delaying or denying) insurance claims filed by Oregonians is sufficient to meet that prong, under the *Calder* effects test. That is, CNOFG is alleged to have taken affirmative actions in contravention of the rights of Bankers' policy holders, necessarily if implicitly with the knowledge that those policy holders were residents of Oregon, with consequent harm to the affected Oregonians in Oregon. *See Dole Food Co.*, 303 F.3d at 1111.

At the second prong of the test, the court's task is to determine whether each of the plaintiffs' claims arise out of CNOFG's forum-related activities. Analysis of plaintiffs' allegations establishes that plaintiffs' elder abuse, breach, and intentional misconduct claims are each premised in whole or in part upon defendants' claims-handling practices, in which CNOFG allegedly played a direct role. As to these three claims, therefore, the second prong of the test is satisfied.

As to the fraudulent inducement claim, however, a different analysis obtains. As a

preliminary matter, it is not altogether obvious precisely what the gravamen of the claim is

intended to be.  Plaintiffs' original and first amended complaints each clearly alleged defendants'

liability for fraud in inducing the plaintiffs to enter into Bankers' long-term health-care insurance

policies.  However, by and through their memorandum in opposition to defendants' motion to

dismiss (and at oral argument in connection with that motion), plaintiffs expressly abandoned

their pled theory of fraud in the inducement in favor of a novel, unpled theory according to which

defendants' fraud was intended to induce plaintiffs not to enter into the insurance contracts but

rather to continue paying premiums pursuant to the agreements they had already previously

entered into.  Nevertheless, following oral argument in connection with the motions now before

the court, plaintiffs amended their complaint a second time, once again pleading a theory of

fraudulent inducement to enter into the insurance contracts in the first instance, and making no

allegations in support of the theory espoused by the plaintiffs in their briefing and at oral

argument.[3]

Plaintiffs' second amended complaint is plaintiffs' operative pleading in this matter and

governs the scope of plaintiffs' claims.  *See, e.g.*, *Brawner v. Pearl Assurance Co.*, 267 F.2d 45,

49 n. 2 (9th Cir. 1958).  I therefore construe plaintiffs' third enumerated claim for relief, alleging

defendants' liability for fraud, as a claim for fraud in inducing plaintiffs to purchase long-term

health-care insurance from Bankers.  As such, the claim does not arise out of CNOFG's

forum-related claims-handling activities (and as noted above cannot arise for jurisdictional

---

[3] Indeed, notwithstanding their express allegations that defendants' alleged fraud inhered in inducing the named plaintiffs to enter into long-term health-care insurance agreements during the 1990's, plaintiffs specifically allege in addition that defendants' plan to delay and deny payment of meritorious claims under the policies was conceived and first implemented in 2005.

Page 20 - OPINION AND ORDER

purposes out of CNOFG's mere oversight of Bankers' marketing activities), and this court lacks personal jurisdiction over CNOFG in connection with plaintiffs' fraud claim, to the extent it is CNOFG's own Oregon-related conduct that is at issue.

At the third prong of the test, the court must determine whether CNOFG has met its burden to rebut the presumption that the exercise of personal jurisdiction over it in connection with plaintiffs' elder abuse, breach, and fraudulent misconduct claims would be reasonable. CNOFG has not offered argument or evidence on this question, but rather has argued only the insufficiency of plaintiffs' allegations to support personal jurisdiction over it.  In consequence, CNOFG has not met its burden at the third prong of the test as to plaintiffs' elder abuse, breach, and intentional misconduct claims, and this court may properly exercise personal jurisdiction over it in connection with those claims based on plaintiffs' *prima facie* showing as discussed above.[4]

As noted above, I agree with CNOFG that plaintiffs' allegations of CNOFG's forum-directed conduct are insufficient to support a finding that this court may properly exercise personal jurisdiction over CNOFG for purposes of plaintiffs' fraudulent inducement claim based on CNOFG's own contacts with Oregon.  In the alternative, plaintiffs argue that this court may properly impute Bankers' contacts with Oregon to CNOFG, Bankers' ultimate corporate parent. Plaintiffs argue that such imputation may be appropriate on either an alter ego theory or an

---

[4]  This disposition will be without prejudice to CNOFG's right at a later stage of these proceedings to renew its challenge to this court's exercise of personal jurisdiction over it in connection with these three claims at trial, summary judgment, or evidentiary hearing.

agency theory.[5]

In general, "[t]he existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum." *Unocal*, 248 F.3d at 925, *citing Transure, Inc. v. Marsh and McLennan, Inc.*, 766 F.2d 1297, 1299 (9th Cir. 1985). However, where "the parent and subsidiary are not really separate entities, or one acts as an agent of the other, the local subsidiary's contacts with the forum may be imputed to the foreign parent corporation." *Id.*, quoting *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996).[6]

In order to establish specific personal jurisdiction over a defendant based on the contacts of its subsidiary on an alter ego theory, a plaintiff must make out a *prima facie* case "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Id.* at 926 (internal modifications omitted), quoting *American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996). Such unity of interest is present where "a parent corporation uses its subsidiary 'as a marketing conduit' and attempts to shield itself from liability based on its subsidiaries' activities," *id.*, quoting *United States v. Toyota Motor Corp.*, 561 F. Supp. 354, 359 (C.D. Cal. 1983), or "where the record indicates that

---

[5]  As discussed in greater detail below, plaintiffs' alter ego and agency theories of imputation of contacts for specific personal jurisdictional purposes are not identical to plaintiffs' alter ego and agency theories of vicarious liability, analyzed below, and are governed by differentiable legal standards.  In consequence, analysis of the proffered bases for imputation of contacts in the jurisdictional context is not dispositive of plaintiffs' theories of vicarious liability.

[6]  For federal jurisdictional purposes, I look primarily to federal alter ego and agency law to determine whether imputation of Bankers' contacts to CNOFG could be appropriate under *Unocal*.

the parent dictates 'every facet of the subsidiary's business -- from broad policy decisions to routine matters of day-to-day operation," *id.* at 926-927, *quoting Rollins Burdick Hunter of Southern California, Inc. v. Alexander & Alexander Services, Inc.*, 206 Cal. App. 3d 1, 11 (2d Dist. Cal. 1988).  By contrast, the courts of the Ninth Circuit have routinely found a plaintiff's *prima facie* showing insufficient to establish the absence of separate corporate personalities where the entities observe the appropriate corporate formalities, notwithstanding significant involvement by the parent in the subsidiary's operations:

> A parent corporation may be directly involved in financing and macro-management of its subsidiaries. . . without exposing itself to a charge that each subsidiary is merely its alter ego.  *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459-60 (2d Cir. 1995) (no alter ego liability where parental approval required for leases, major capital expenditures and the sale of the subsidiary's assets); *Joiner v. Ryder Sys.*, 966 F. Supp. 1478, 1485 (C.D. Ill. 1996) (no alter ego liability where parent approved subsidiaries' acquisitions and capital budget); *Akzona, Inc. v. E.I. Du Pont De Nemours and Co.*, 607 F. Supp. 227, 238 (D. Del. 1984) (blurring corporate separateness in language of annual report, overlap of boards of directors, parental approval of large capital expenditures, and parental guaranty of third-party loans to subsidiary insufficient to establish alter ego relationship); *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 473-74 (Bankr. M.D. Fla. 1994) (proper for parent to provide all financing to a subsidiary), *aff'd* 176 B.R. 223 (M.D. Fla. 1994).
>
> * * *
>
> Likewise, references in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship.  *See Fletcher*, 68 F.3d at 1459-60 (references to subsidiary as "division" of Kodak not equivalent to evidence that two companies operated as "single economic entity"); *Akzona*, 607 F. Supp. at 238 (language of annual report and employee testimony describing subsidiaries as divisions of parent not sufficient, even in conjunction with other evidence, to establish alter ego relationship).
>
> . . .   In a case presenting similar questions, the Ninth Circuit found no alter ego relationship was created where the parent company guaranteed loans for the subsidiary, reviewed and approved major decisions, placed several of its directors

on the subsidiary's board, and was closely involved in the subsidiary's pricing decisions. *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980) . . . .

*Id.* at 927-928 (holding that because the corporate parent and subsidiary defendants before it "observe[d] all of the corporate formalities necessary to maintain corporate separateness" notwithstanding the parent's active involvement in the subsidiaries' operations, the evidence did not establish that the entities were alter egos of one another).

Here, plaintiffs proffer evidence that CNOFG "tightly controlled every aspect of Bankers' business, from hand-picking its executive Vice presidents to setting the budget goals and participating in Bankers strategy meetings."  In addition, plaintiffs offer evidence that Banker did not maintain its own human resources department, but rather depended on CNOFG to provide HR services, and that CNOFG was involved in processing claims made on Bankers' insurance policies.  As was the case in *Unocal*, however, such evidence is far short of what would be required to support the conclusion that CNOFG and Bankers routinely disregarded the corporate formalities establishing separate existence, that CNOFG controlled every facet of Bankers' business, or that CNOFG maintained Bankers solely as a shield against liability for activities it conducted under bankers' auspices.  Because plaintiffs have not made out a *prima facie* case of unity of interest between CNOFG and Bankers, this court may not exercise specific personal jurisdiction over CNOFG in connection with plaintiffs' fraud in the inducement claim based on an alter ego theory.

In order to establish specific personal jurisdiction over a defendant based on the contacts of its subsidiary on an agency theory, a plaintiff must make a *prima facie* showing that "the subsidiary functions as the parent corporation's representative in that it performs services that are

'sufficiently important to the foreign corporation that if it did not have a representative to perform

them, the corporation's own officials would undertake to perform substantially similar services.'"

*Id.* at 928, *quoting Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994). That

is, imputation of contacts is appropriate on an agency theory where the subsidiary "functions as

'merely the incorporated department of its parent,'"and "the subsidiaries' presence substitutes for

the presence of the parent" for all operational purposes." *Id.*, *quoting Gallagher v. Mazda Motor

of America, Inc.*, 781 F. Supp. 1079, 1084 (E.D. Pa. 1992).

      Here, plaintiffs do not attempt to meet the foredescribed standard. Instead, plaintiffs

argue that Bankers was CNOFG's agent because Bankers carried out directives issued by its

parent entity and acted in some sense on authority delegated by CNOFG. If plaintiffs' argument

were apposite, the result would be that virtually all corporate parents could be haled into court in

any jurisdiction in which they had subsidiaries, on the ground that virtually all subsidiaries serve

as their parents' agents for some purposes. However, such garden-variety forms of agency are

insufficient to satisfy the jurisdictional agency standard, which requires that but for the

subsidiary's presence in the jurisdiction, the parent would necessarily be present performing all of

the same functions actually performed by its subsidiary. "At an irreducible minimum, the general

agency test requires that the agent perform some service or engage in some meaningful activity in

the forum state on behalf of its principal such that its 'presence substitutes for presence of the

principal.'" *Id.* at 930, *quoting Gallagher*, 781 F. Supp. at 1084; *see also Daimler AG*, 2014 U.S.

LEXIS 644 at *35-36, *36 n. 15 (rejecting agency theory of specific personal jurisdiction

formally indistinguishable from that espoused by CNOFG here). Because plaintiffs have made

no showing that Bankers serves as an incorporated department of CNOFG rather than as a

Page 25 - OPINION AND ORDER

genuine subsidiary, this court may not properly exercise specific personal jurisdiction over CNOFG in connection with plaintiffs' fraud in the inducement claim based on an agency theory. Plaintiffs' fraud in the inducement claim is therefore dismissed without prejudice to the extent alleged against CNOFG only, for lack of personal jurisdiction in this district. This court may properly exercise specific personal jurisdiction over each of plaintiffs' remaining claims.

## II.    Defendants' Motion (#32) to Strike Class Allegations

As noted above, plaintiffs propose three separate classes of named and absent plaintiffs: (i) Oregonian policy-holders whose claims have been mishandled by Bankers through a combination of delay and nonpayment of claims between 2005 and the present, notwithstanding timely payment of all policy premiums (plaintiffs' "Class A," putatively represented here by Lorraine Bates, Eileen Burk, and Thomas Marier), (ii) family members and other representatives of such policy-holders who have incurred expenses in the course of attempting to obtain benefits for their policy-holder family members under their policies (plaintiffs' "Class B," putatively represented here by Charles Ehrman Bates, David Youngbluth, and Dolores Marier), and (iii) Oregonian policy-holders who have paid all policy premiums on a timely basis and who have not yet filed any claim under their policies (plaintiffs' "Class C," putatively represented here by Charles Ehrman Bates, Dolores Marier, David Castagno, and Darla Castagno). For the reasons set forth below, plaintiffs' claims are not appropriate for class treatment, and defendants' motion to strike class allegations is granted.

Federal Civil Procedure Rule 23(a) provides that named plaintiffs may represent a class of similarly situated persons in a class action lawsuit only where:

(1)    the class is so numerous that joinder of all members is impracticable,

(2)     there are questions of law or fact common to the class,

(3)     the claims or defenses of the representative parties are typical of the claims
        or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of
        the class.

Fed. R. Civ. P. 23(a).  Federal Civil Procedure Rule 23(b) provides, in addition, that a class

action may only be maintained if at least one of the following three factors is satisfied:

(1)     prosecuting separate actions by or against individual class members would
        create a risk of:

        (A)     inconsistent or varying adjudications with respect to individual
                class members that would establish incompatible standards of
                conduct for the party opposing the class; or

        (B)     adjudications with respect to individual class members that, as a
                practical matter, would be dispositive of the interests of the other
                members not parties to the individual adjudications or would
                substantially impair or impede their ability to protect their
                interests;

(2)     the party opposing the class has acted or refused to act on grounds that
        apply generally to the class, so that final injunctive relief or corresponding
        declaratory relief is appropriate respecting the class as a whole; or

(3)     the court finds that the questions of law or fact common to class members
        predominate over any questions affecting only individual members, and
        that a class action is superior to other available methods for fairly and
        efficiently adjudicating the controversy.  The matters pertinent to these
        findings include:

        (A)     the class members' interests in individually controlling the
                prosecution or defense of separate actions;

        (B)     the extent and nature of any litigation concerning the controversy
                already begun by or against class members;

        (C)     the desirability or undesirability of concentrating the litigation of
                the claims in the particular forum; and

>       (D)      the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

In the context of a motion to certify a class, it is the plaintiffs who bears the burden to establish that the class is certifiable.  However, in the context of a motion to *strike* class allegations, in particular where such a motion is brought in advance of the close of class discovery, it is properly the defendant who must bear the burden of proving that the class is *not* certifiable.  Towards meeting that burden, defendants argue primarily that no plaintiff's claims are "typical" of all plaintiffs' claims, such that plaintiffs cannot meet the requirements of Rule 23(a)(3).

>       Pursuant to Federal Civil Procedure Rule 23(a)(3):
>
>       The typicality prerequisite of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Under the rule's permissive standards, representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  In support of their argument that plaintiffs cannot meet the requirements of Rule 23(a)(3), defendants point to evidence that the absent putative plaintiffs and/or their family members did not purchase identical long-term health-care policies from Bankers, but rather purchased policies with different lifetime and daily coverage maxima and different coverage exclusions, among other policy provisions.  In consequence, defendants argue, both liability and damages will require individual analysis and calculation for every member of each putative class.  Defendants additionally take the position that, as is the case for the named plaintiffs, all absent members of putative Class A and putative Class B will allege different conduct to establish breach of applicable policy provisions,

Page 28 - OPINION AND ORDER

necessitating individual analysis and determination of each such plaintiff's claims premised on

defendants' claims-handling procedures and/or improper delay or denial of claims.  In similar

vein, defendants argue that each policyholder will have received a different combination of

marketing materials and will have received different specific representations regarding the policy

from defendants' (various) sales agents at the time of purchase, requiring separate individual

evaluation of the fraud in the inducement and related claims for each absent member of putative

Class A and putative Class B.  As to the members of putative Class C, defendants argue that

because such plaintiffs' claims are purely speculative, and because by proposed definition no

such member has suffered any actual injury in consequence of defendants' alleged conduct, the

claims are not appropriate for class treatment.

       I agree with the defendants as to the members of putative Class A and putative Class B

(and as to the members of putative Class C to the extent their claims are premised on fraud in the

inducement).  To the extent such plaintiffs' claims are premised on allegations of claims

mishandling, such claims inevitably require case-by-case analysis of the operative facts, because

the inquiry is in all respects fact-specific for every insured, including inquiry as to the insureds'

particular health conditions and medical needs, the particular care provided and the nature of the

particular institution within which care was provided, and the specific coverage and exclusion

provisions of the particular policy at issue.  That is, to establish that defendants are liable for

breach of a provision of one insured's contract cannot establish that defendants are likewise liable

for breach of all or even any other similarly situated insureds' contracts.  To the extent such

plaintiffs' claims are premised on fraud in the inducement, a similar case-by-case analysis of

operative facts would be required, in that the policies at issue were sold following verbal

Page 29 - OPINION AND ORDER

negotiations between policy purchasers and Bankers' various sales agents, and each plaintiff

would need to make an individual showing of the conduct constituting fraud, of that plaintiff's

actual reliance on defendants' misrepresentation, and of the other elements of fraud in the

inducement.

As to the members of putative Class C to the extent their claims are premised on the

concern that their possible future claims under their long-term health-care policies will one day

be mishandled, defendants' arguments are entirely inapposite.  Indeed, the claims of the named

plaintiffs putatively representing Class C are necessarily entirely typical of those of all absent

members of putative Class C, in that all such plaintiffs share the same combination of legal

issues and (lack of) operative facts.  However, for reasons discussed below, it is clear as a matter

of law that to the extent any named or absent plaintiff is a member of putative Class C, that

plaintiff lacks standing to pursue claims against the defendants.  In consequence, the fact that

proposed Class C may partially satisfy the typicality requirement of Rule 23(a)(3) provides no

grounds for denial of defendants' motion to strike.

Plaintiffs argue that further proceedings in connection with defendants' motion to strike

should be deferred until such time as the parties have exchanged documents in class-related

discovery.  I disagree.  Even if such discovery were to establish clearly that defendants had a

policy of improperly delaying and denying meritorious claims brought under Bankers' long-term

health-care policies, as the named plaintiffs' claims illustrate, the details of the defendants'

implementation of their uniform policy as to any given plaintiff, the court's determination

whether the complained-of tactics were in any given instance actionable, and the calculation of

any given plaintiff's resulting damages would require separate analysis and litigation for every

Page 30 - OPINION AND ORDER

plaintiff, whether named or absent.  Similarly, even if discovery were to establish that defendants promulgated entirely uniform marketing materials to every one of Bankers' sales agents who sold policies to the putative class members, and that such sales agents had been instructed to market the policies according to a uniform script, such discovery would not obviate the need for individual inquiry into the extent to which the sales agents might have deviated from the script in specific cases, or the need for plaintiffs to make individualized showings of the elements of their claims to the extent premised on fraud.

Plaintiffs' inability to satisfy the requirements of Rule 23(a)(3) provides sufficient grounds, without more, for granting defendants' motion to strike.  *See* Fed. R. Civ. P. 23(a). In addition, however, it is far from clear that plaintiffs could satisfy the requirements of Rule 23(b).  As to Rule 23(b)(1), separate adjudication of the absent plaintiffs' claims does not appear likely to establish incompatible standards of conduct for defendants, because the applicable standards are well-established and unlikely to be changed as a result of fact-specific individual applications to an array of plaintiffs, and there appears to be little risk that adjudication of one such plaintiff's claims would be dispositive of any other such plaintiff's claims because, as discussed above, each plaintiff's claims will require individual analysis and inquiry.  As to Rule 23(b)(2), the named and absent plaintiffs here primarily seek money damages rather than injunctive or declaratory relief from the defendants, and the putative class members' claims could not be resolved by the entry of a single injunctive order.  As to Rule 23(b)(3), for the same reasons that the named plaintiffs' claims cannot be deemed typical of the absent putative class members' claims, individual issues predominate over common issues, and class treatment does not appear to be superior to other alternative ways of resolving all putative class members'

Page 31 - OPINION AND ORDER

claims.[7]

### III.    Defendants' Motion (#39) to Dismiss for Failure to State a Claim; CNOFG's Motion (#29) to Dismiss for Failure to State a Claim

By and through their motion (#39) to dismiss, defendants Bankers and CNOFG seek

dismissal of plaintiffs' elder abuse, fraud in the inducement, and intentional misconduct claims in

their entirety, dismissal of plaintiffs' breach claims to the extent premised on Bankers' conduct in

raising the premium payments due under plaintiffs' long-term health-care insurance policies, and

(partially in the alternative) dismissal of plaintiffs' claims to the extent they may be time-barred

in whole or in part, to the extent certain plaintiffs may lack standing to bring their claims, and/or

to the extent plaintiffs may seek impermissible relief in connection with their claims.  In addition

(as noted above), by and through its motion (#29) to dismiss for failure to state a claim, CNOFG

challenges the adequacy of plaintiffs' allegations of CNOFG's direct involvement in the conduct

underlying plaintiffs' claims and alternatively challenges the adequacy of  plaintiffs' allegations in

support of their alter ego and agency theories of CNOFG's liability on their claims.[8]  In the

---

[7]  Indeed, I take judicial notice of the Oregon Department of Consumer and Business Services Insurance Division's Stipulation and Final Order dated December 13, 2013, resolving *In the Matter of Bankers Life and Casualty Company*, Case No. INS 13-06-003, an administrative proceeding under Or. Rev. Stat. 731.256 initiated against Bankers by the Insurance Division arising out of precisely the same conduct complained of by the plaintiffs herein.  The Insurance Division expressly found therein that "to determine the individual facts of each case. . . would entail significant time, effort and expense given the variation in policy forms and the individual facts of each policyholder and his or her claim(s). . . ."  In addition, the Insurance Division's administrative decision arguably constitutes a method for resolution of the claims of the absent plaintiffs superior to class action treatment, in that the Insurance Division has now ordered Bankers to ensure proper claims handling in the future, to review approximately 26,000 claims involving over 2,000 policy-holders to determine whether claims were mishandled and, where evidence of mishandling is uncovered, to pay benefits still owing to all such policy-holders.

[8]  As discussed above, this court may properly exercise personal jurisdiction over defendant CNOFG in connection with plaintiffs' elder abuse, breach, and intentional misconduct

discussion that follows, I address the material issues raised by both Rule 12(b)(6) motions.

For the reasons set forth below, (i) defendants' motion (#39) to dismiss for failure to state a claim is granted with prejudice as to plaintiffs' elder abuse claim in its entirety, with prejudice as to plaintiffs' fraud claim to the extent premised on a theory of fraudulent inducement to continue paying policy premiums pursuant to pre-existing insurance contracts, without prejudice as discussed below as to plaintiffs' fraud claim to the extent premised on a theory of fraudulent inducement to enter into the insurance policies in the first instance, with prejudice as to plaintiffs' intentional misconduct claim in its entirety, with prejudice as to all claims brought by the Castagno plaintiffs and as to plaintiffs Charles Ehrman Bates and Dolores Marier to the extent premised solely on those plaintiffs' concern regarding possible future breach, and with prejudice as to all claims brought by plaintiffs Charles Ehrman Bates, David Youngbluth, and Dolores Marier to the extent brought on those plaintiffs own behalf rather than on behalf of those plaintiffs' family members who sought benefits under their Bankers policies, and is otherwise denied; and (ii) CNOFG's motion (#29) to dismiss for failure to state a claim is denied as moot as to plaintiffs' elder abuse, fraud in the inducement, and intentional misconduct claims and is otherwise denied on its merits.

---

claims, based on plaintiffs' allegations that CNOFG directly participated in the complained-of conduct underlying those claims. Plaintiffs allege CNOFG's liability in connection with those three claims based on its own conduct and, alternatively, on a theory of alter ego or of agency liability. Although in the discussion above I found that plaintiffs had failed to make a prima facie showing supporting either their alter ego or their agency theory of imputation of contacts for jurisdictional purposes, such finding was made in the context of CNOFG's jurisdictional challenge, and CNOFG's alternative motion to dismiss for failure to state a claim is governed by a different legal and evidentiary standard. Plaintiffs' failure to make a *prima facie* showing of evidentiary facts supporting their alter ego and agency theories therefore does not control the analysis of whether plaintiffs have adequately alleged facts which, if proven, would permit a jury to find CNOFG vicariously liable on either such theory.

Page 33 - OPINION AND ORDER

A.      **Plaintiffs' Elder Abuse Claim**

Or. Rev. Stat. 124.100(2) creates a statutory cause of action for financial or other abuse of

a "vulnerable person," defined *inter alia* as a person aged 65 or older.  *See* Or. Rev. Stat.

124.100(2), 100(1)(a), 100(1)(e)(A).

> An action may be brought under ORS 124.100 for financial abuse in the following
> circumstances:
>
> > (a)      When a person wrongfully takes or appropriates money or property
> > of a vulnerable person, without regard to whether the person taking
> > or appropriating the money or property has a fiduciary relationship
> > with the vulnerable person.
>
> > (b)      When a vulnerable person requests that another person transfer to
> > the vulnerable person any money or property that the other person
> > holds or controls and that belongs to or is held in express trust,
> > constructive trust or resulting trust for the vulnerable person, and
> > the other person, without good cause, either continues to hold the
> > money or property or fails to take reasonable steps to make the
> > money or property readily available to the vulnerable person when:
>
> > > (A)      The ownership or control of the money or property was
> > > acquired in whole or in part by the other person or someone
> > > acting in concert with the other person from the vulnerable
> > > person; and
>
> > > (B)      The other person acts in bad faith, or knew or should have
> > > known of the right of the vulnerable person to have the
> > > money or property transferred as requested or otherwise
> > > made available to the vulnerable person.
>
> > (c)      When a person has at any time engaged in conduct constituting a
> > violation of a restraining order regarding sweepstakes that was
> > issued under ORS 124.020.

Or. Rev. Stat. 124.110(1).  "A claim is stated under [Section 124.110(1)(b)] when it is alleged

that (1) the vulnerable person requests that another person transfer money to the vulnerable

person; (2) the money requested to be transferred belongs to the vulnerable person; (3) the other

person continues to hold the money or fails to take reasonable steps to make the money readily
available to the vulnerable person; (4) *the money was acquired from the vulnerable person*; and
(5) the other person acts in bad faith, or knew or should have known of the right of the vulnerable
person to have the money * * * transferred as requested or otherwise made available to the
vulnerable person." *Hoffart v. Wiggins*, 226 Or. App. 545, 549 (2009) (emphasis supplied).

As pled in plaintiffs' original and first amended complaints, plaintiffs' elder abuse claim
was expressly premised on alleged financial abuse both in connection with defendants' claims-
handling practices and in connection with inducing plaintiffs to enter into their long-term health-
care policies.  However, in opposition to defendants' motion to dismiss and at oral argument in
connection with the motion, plaintiffs expressly abandoned their elder abuse claim to the extent
premised on fraud in the inducement, and argued only that defendants financially abused the
plaintiffs by delaying and/or denying meritorious claims for benefits.  Nevertheless, following
oral argument in connection with defendants' motion, plaintiffs amended their pleading and
restated their elder abuse claim as if premised on both claims mishandling and fraud in the
inducement.

To the extent the claim is premised on wrongful delay and/or denial of meritorious claims
filed under plaintiffs' long-term health-care policies, it is not cognizable as elder abuse under
Oregon's statutory scheme.  Pursuant to *Hoffart*, retention of moneys belonging to a vulnerable
person is actionable under Section 124.100(2) only where "the money was acquired [by the
defendant] from the [elderly] person," *see Hoffart*, 226 Or. App. at 549, which is to say under the
bailment or trust scenarios expressly referenced in the statutory language, *see* Or. Rev. Stat.
124.110(1)(b).  Because delay or denial of insurance benefits does not constitute retention of

Page 35 - OPINION AND ORDER

moneys "acquired from" the insured, there is no elder abuse claim under Section 124.100(2) arising out of defendants' alleged claims-handling practices.

To the extent the claim is premised on fraud in the inducement, such conduct does appear to be cognizable as elder abuse under Sections 124.100(2) and 124.110(1) as currently codified. *See, e.g.*, *Cruze v. Hudler*, 246 Or. App. 649, 666 (2011). However, under the circumstances it is nevertheless not actionable as such, in that the Bates policy was purchased on or around June 30, 1998, the Burk policy was purchased on or around July 27, 1995, the Marier policy was purchased on or around April 1, 1994, and the Castagno policy was purchased on or around July 31, 1995, whereas Section 124.110(2) was only made applicable against non-fiduciaries of the vulnerable person in 1999, with no expression of intent to make the change applicable retroactively. *See* Or. Rev. Stat. 124.110(2) (1995); Or. Rev. Stat. 124.110(2) (1999); 1999 Or. Adv. Leg. Serv. 305. In consequence, plaintiffs' claims arising out of pre-1999 conduct are not actionable under the statute, notwithstanding the fact that the conduct was not discovered until after the change was enacted.

Because the complained of conduct does not give rise to any cause of action under Sections 124.100(2) and 124.110(1), plaintiffs' elder abuse claim is dismissed with prejudice in its entirety as to all defendants. In consequence, I need not address CNOFG's arguments in support of its Rule 12(b)(6) motion to the extent they address the elder abuse claim.

### B.    Plaintiffs' Fraud in the Inducement Claim

Under Oregon law, the elements of a fraud claim are:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance

of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Webb*, 274 Or. at 391; *Johnsen v. Mel-Ken Motors*, 134 Or. App. 81, 89 (1995).  While the elements of plaintiffs' fraud claim are governed by Oregon substantive law, federal procedural law governs the manner in which those elements must be pled.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  By and through their motion (#39) to dismiss, defendants challenge both the adequacy of plaintiffs' allegations to satisfy heightened federal pleading standards applicable to claims of fraud and, alternatively, whether plaintiffs have stated a fraud claim upon which relief can be granted under Oregon law.[9]

### 1.    Federal Pleading Standard Applicable to Fraud

Federal Civil Procedure Rule 9(b) provides, in relevant part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  The Rule 9(b) particularity requirement is satisfied if the pleading "identifies the circumstances constituting fraud . . . so that the defendant can prepare an adequate answer from the allegations."  *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).  That is, the allegations must be sufficiently specific "to give defendants notice of the particular misconduct which is alleged to constitute the fraud . . . so that they can defend against the charge and not just deny that they have done anything wrong."  *Semegen v. Weidener*, 780 F.2d 727, 731 (9th Cir. 1985).

---

[9]  Because for reasons discussed above this court lacks personal jurisdiction over CNOFG in connection with plaintiffs' fraud claim, I do not address CNOFG's arguments in support of its motion (#29) to dismiss for failure to state a claim to the extent they address plaintiffs' theories of fraud.

As noted above, by and through their originally filed and first amended complaints, plaintiffs alleged defendants' liability for fraud specifically in the inducement to enter into long-term health-care insurance policies with Bankers.  However, in opposition to defendants' motion to dismiss and at oral argument in connection therewith, plaintiffs expressly abandoned their pled theory of fraud in the inducement in favor of a novel, unpled theory according to which defendants' fraud was intended to induce plaintiffs not to enter into the insurance contracts but rather to continue paying premiums pursuant to the agreements they had already entered into. Subsequently, plaintiffs amended their complaint a second time, and in their second amended complaint plaintiffs allege only defendants' fraud in the inducement to enter into the insurance agreements, and make no allegations in support of their theory of fraud in the inducement to continue paying insurance premiums in compliance with their contractual obligations under the existing policies.

To the extent that, notwithstanding their express abandonment of their pled theory of fraud, plaintiffs intend to pursue their claim on a theory of fraud in the inducement to enter into the insurance policies in the first instance, the allegations of plaintiffs' second amended complaint contain more than sufficient particularity to satisfy the Rule 9(b) pleading standard. Plaintiffs' allegations identify in great detail the material misrepresentations that defendants are alleged to have made through their sales agents and the material information defendants elected not to disclose to the plaintiffs, identify three of the sales agents in question by name, specify that plaintiffs were unaware of the falsity of defendants' misrepresentations, and assert plaintiffs' reasonable reliance thereon.  *See* Second Amended Complaint, ¶¶ 145-155.  Such particularity of pleading is sufficient to identify all of the circumstances allegedly constituting fraud, and to give

defendants' adequate notice to prepare their defense.  To the extent plaintiffs intend to pursue a theory of fraud in the inducement to enter into long-term health-care insurance contracts with Bankers, no grounds exist for dismissal of their claim for failure to satisfy the applicable pleading standard.

By contrast, to the extent that plaintiffs intend to pursue their alternative theory of fraud in the inducement to continue paying insurance premiums, the second amended complaint contains no allegations of fact in support of that theory, and therefore necessarily does not meet the Rule 9(b) standard.  Normally it would be appropriate under the circumstances to provide plaintiffs a further opportunity to amend their pleading to clarify their allegations of fraud and to identify with precision the theory or theories they intend to pursue.  However, because for reasons set forth below plaintiffs' argued-but-unpled theory does not lie as a matter of Oregon law, it is appropriate here to dismiss plaintiffs' fraud in the inducement claim with prejudice to the extent premised on fraudulent inducement to continue paying insurance premiums.

### 2.    Adequacy of Plaintiffs' Allegations of Fraud to State a Claim

As noted above, by failing to plead allegations in support of their espoused theory of fraud in the inducement to continue paying insurance premiums, plaintiffs failed to meet the Rule 9(b) pleading standard with respect to that theory.  Moreover, assuming *arguendo* that plaintiffs would, if given the opportunity, amend their pleading to state allegations in support thereof, the theory would nevertheless fail as a matter of Oregon law.

I am aware of no Oregon case suggesting that a party could be liable for fraudulent inducement to continue complying with existing and undisputed contractual obligations, and plaintiffs cite to none.  In addition, good grounds exist for concluding that the Oregon courts

would not endorse such a theory in the insurance context in particular, in that Oregon statutory

law vests sole authority to regulate insurance practices in the Director of the Department of

Consumer and Business Services, *see* Or. Rev. Stat. 731.004-016 *et seq.*, and the Director has

enacted no statute or regulation creating a cause of action for collecting insurance premiums with

the intent not to pay claims.  *See, e.g., Pearson v. Provident Life & Accident Ins. Co.*, 834 F.

Supp. 2d 1199, 1205 (D. Or. 2004) (analyzing Oregon law and so concluding).  It would

therefore be futile to provide plaintiffs with an opportunity to amend their complaint to cure the

deficiencies in their allegations in support of their fraud claim to the extent intended to state a

claim of fraudulent inducement to continue paying insurance premiums, and the claim is

therefore to that extent dismissed with prejudice.

       To the extent that, notwithstanding their express abandonment thereof, plaintiffs intend to

pursue their claim as pled – that is, on a theory of fraud in the inducement to enter into the

insurance policies in the first instance – the allegations of plaintiffs' Second Amended Complaint

contained in paragraphs 145 to 155 thereof, considered in isolation from the rest of plaintiffs'

complaint, are clearly sufficient to state a claim for fraud in the inducement.[10]  The analysis

becomes more complicated, however, when plaintiffs' allegations of fraud are considered – as is

appropriate – in the context of their pleading as a whole.  At paragraph 24 of the Second

Amended Complaint, plaintiffs allege that it was not until the "mid-2000s" that CNOFG "became

concerned that the profitability of its long-term care business (consisting mainly of Bankers

policies) had declined because premiums were not keeping pace with the rise in pay-outs of

---

    [10]  This is not to suggest that the claim as pled is plausible, but only that the supporting
allegations, if proven true, would give rise to a cause of action.

benefits," and at paragraph 25 plaintiffs allege that it was not until 2005 that "William Kirsh, the CEO of CNO[FG], devised a plan for Bankers to significantly reduce the number of long-term care benefits it was paying," specifically "to shift revenues from paying policy holders' legitimate claims to CNO[FG]'s bottom line" by implementing a policy of delay, obstruction, and denial of meritorious claims. Second Amended Complaint at ¶¶ 24-25; *see also id.* at ¶¶ 26-27. Similarly, plaintiffs allege at paragraph 34 that it was not until 2005 that "Bankers and its parent CNO[FG] knew that they could not deliver on their promises [to process meritorious claims without undue delay, improper denial, or other obstruction] because of the rising costs of healthcare for the elderly, and because they had underestimated how many policy holders would survive long enough to receive elder disability care benefits." *See id.* at ¶ 34. These allegations strongly undercut plaintiffs' theory of fraud as pled at paragraphs 145 to 155 of the Second Amended Complaint, which is necessarily premised on the proposition that defendants intended not to "deliver on" the subject promises but rather to conduct themselves in conformity with Kirsh's later-developed plan as of the time plaintiffs purchased their policies from Bankers. Indeed, it is not possible to assume the truth of the allegations at paragraphs 24 to 27 and 34 and also to assume the truth of the supporting allegations at paragraphs 145 to 155.

Under all of the circumstances, including plaintiffs' express repudiation of their pled theory of fraud in the inducement, I conclude that it is appropriate to dismiss plaintiffs' fraud claim without prejudice to the extent premised on a theory of fraudulent inducement to enter into insurance contracts with Bankers. In the event plaintiffs have cause to believe that they can in good faith prosecute a claim so premised, and on that basis move for leave to amend their pleading once again to state such a claim, such leave will be granted.

Page 41 - OPINION AND ORDER

### C.    Plaintiffs' Intentional Misconduct Claim

Under Oregon law, an insured's claim may sound against an insurer in tort as well as in contract, under appropriate circumstances, in particular in connection with the insurer's duty of care in the exercise of its duty to defend its insured.  "[W]here a duty arises from a contractual relationship between the parties, an action in tort may lie." *Georgetown Realty v. Home Ins. Co.*, 313 Or. 97, 102 (1992).

> The lesson to be drawn from this court's cases discussing the choice between contract and tort remedies is this:  When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract.  If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation.  That is so whether the breach of contract was negligent, intentional, or otherwise.  In some situations, a party may be able to rely on either a contract theory or a tort theory or both.  *See Ashmun v. Nichols*, 92 Or [223,] 234-35 [(1919)] (suggesting that a plaintiff might be able to rely on both contract and tort theories).

*Id.* at 106.  The *Georgetown Realty* court reasoned as follows:

> [T]he pivotal question, in deciding whether one party to a contract may sue another party to the contract in tort for negligent performance of a term of the contract, is whether the allegedly negligent party is subject to a standard of care independent of the terms of the contract.  This court has not previously answered that question in the [insurance] context.  None of this court's prior cases concerning excess claims has expressly decided whether the liability insurer is subject to a standard of care that exists independent of the contract and without reference to the specific terms of the contract.

> We now reach the same conclusion with regard to liability insurers that this court reached in the cases concerning physicians, lawyers, architects, and others.  *See ante* at 102-06.  As in those cases, the relationship here is between contracting parties.  When a liability insurer undertakes to "defend," it agrees to provide legal representation and to stand in the shoes of the party that has been sued.  The

Page 42 - OPINION AND ORDER

> insured relinquishes control over the defense of the claim asserted. Its potential
> monetary liability is in the hands of the insurer.  That kind of relationship carries
> with it a standard  of care that exists independent of the contract and without
> reference to the specific terms of the contract. . . .  Therefore, [an] excess claim
> [against an insurer] can be brought as a claim for negligence.

*Id*. at 110-111.  Plaintiffs' fourth enumerated claim for relief, styled as a claim for "intentional

misconduct," appears to be intended to state such a tort claim.  Specifically, plaintiffs' theory

appears to be that in enacting the elder-abuse provisions of the Elderly Persons and Persons with

Disabilities Abuse Prevention Act codified at Or. Rev. Stat. 124.005 *et seq.*, discussed *supra*, the

state of Oregon imposed upon insurers a special duty of care owed to elderly insureds, and that

this special duty creates a standard of care independent of the insurance policies at issue here, in

connection with which plaintiffs may sue the defendants in negligence.  The problem with

plaintiffs' theory is that Oregon's Elderly Persons and Persons with Disabilities Abuse Prevention

Act does not expressly or impliedly create such a duty of care, plaintiffs cite no case law

indicating that the Oregon courts have ever read such a duty of care into the statute, and my own

research has not uncovered any such law.  In the absence of any cognizable extra-contractual duty

of care owed by the defendants to the plaintiffs, plaintiffs' intentional misconduct claim cannot

lie as a matter of Oregon law.  In consequence, the intentional misconduct claim is dismissed

with prejudice in its entirety.  I therefore need not address CNOFG's arguments in support of its

Rule 12(b)(6) motion to the extent they address the intentional misconduct claim.

### D.    Defendants' Arguments for Partial Dismissal of Plaintiffs' Claims

Partially in the alternative to the arguments discussed above in support of defendants'

motion (#39) to dismiss plaintiffs' elder abuse, fraud, and intentional misconduct claims in their

entirety, defendants advance several arguments in support of partial dismissal of each of

plaintiffs' claims. Specifically, defendants argue that plaintiffs' claims are subject to partial dismissal to the extent premised on policy premium rate increases promulgated by Bankers subsequent to issuance of the policies, to the extent the claims may be time-barred, to the extent plaintiffs lack standing to bring their claims, and to the extent plaintiffs seek impermissible relief in connection with their claims. In addition, in support of its Rule 12(b)(6) motion (#29) to dismiss, CNOFG argues that each of plaintiffs' claims should be dismissed to the extent alleged against it because plaintiffs have failed adequately to allege its involvement in the conduct underlying the claims or, alternatively, because plaintiffs have failed adequately to allege an alter ego or agency theory of its vicarious liability. Because I have already dismissed plaintiffs' elder abuse, fraud, and intentional misconduct claims in their entirety, I address each of the foredescribed arguments for partial dismissal below as they apply to plaintiffs' breach claims only.[11]

### 1.    Claims Premised on Premium Rate Increases

Plaintiffs allege, and defendants concede, that Bankers has in recent years significantly raised the premiums it charges in connection with the policies issued to the plaintiffs. Defendants characterize each of plaintiffs' claims, including in particular the claims of breach, as premised in large part on the theory that these rate increases were improper. To that extent, defendants argue that the claims fall afoul of the filed rate doctrine and are therefore subject to dismissal.

"The filed rate doctrine holds, generally, that any rate filed with and approved by the

---

[11]  In the event plaintiffs may refile their fraud in the inducement claim as discussed above, my analysis in connection with these arguments will apply *mutatis mutandis* to the refiled claim as well.

relevant ratemaking agency represents a contract between the utility and the customer and is conclusively lawful until a new rate is approved." *Gearhart v. PUC of Or.*, 255 Or. App. 58, 72 (2013) (citation, internal quotation marks omitted). However, "[n]o Oregon court has expressly decided whether Oregon accepts the filed-rate doctrine or the corollary rule against retroactive ratemaking." *Dreyer v. Portland GE*, 341 Or. 262, 271, n. 10 (2006).

Assuming *arguendo* that Oregon has adopted or would adopt the filed-rate doctrine under appropriate circumstances, it is inapposite here. Plaintiffs state expressly that their claims are not premised on any challenge to Bankers' authority to raise its premium rates or to the validity of the rates they have been charged, and analysis of plaintiffs' pleading supports plaintiffs' contention unambiguously. While plaintiffs' fraud and elder abuse claims are supported by allegations that defendants failed to disclose a contemporaneous intention to unilaterally raise rates without commensurate increases in coverage at the time plaintiffs purchased their policies, they do not depend on allegations that the rate increases themselves were invalid, *ultra vires*, or in any sense subject to challenge. Moreover, plaintiffs' breach claims in particular are not supported by any such allegation, but rather are supported by allegations that defendants improperly delayed and denied meritorious claims filed under the policies.

Because the filed-rate doctrine is inapplicable to plaintiffs' claims, defendants' motion (#39) to dismiss should be denied to the extent it addresses claims premised on improper premium rate increases.

### 2.    Time-Barred Claims

As a general rule, claims for breach of contract are subject to a six-year limitations period. *See* Or. Rev. Stat. 12.080. "It is well settled that a contract claim accrues on breach, and

Page 45 - OPINION AND ORDER

not when that breach is subsequently discovered." *Doughton v. Morrow*, 255 Or. App. 422, 432

(2013) (internal quotation marks, modifications omitted) (noting that "ORS 12.080 does not

incorporate a discovery rule"), *quoting Waxman v. Waxman & Associates, Inc.*, 224 Or. App.

499, 508-10 (2008).

Under Oregon law, however, "parties are free to contractually limit the timeframe in

which to bring a claim, and that limit will be enforced unless unreasonable." *Hatkoff v. Portland*

*Adventist Med. Ctr.*, 252 Or. App. 210, 222 (2012), *citing Biomass One, L.P. v. S-P Construction*

*(A61560)*, 103 Or. App. 521, 526 n 4 (1990).  Here, as noted above, plaintiffs are subject to a

contractual three-year limitations period governing actions to "recover on" their Bankers policies,

such three-year period to begin to run as of the date proof of loss is "required to be given" under

the applicable policy, specifically "within 90 days after the end of each period" for periodic

payment of a continuing loss and "within 90 days of the end of [any other] loss."  Where it is not

reasonably possible for an insured to file within 90 days after a loss or continuing loss period,

proof of loss is required within one year.

Here, the contractual three-year limitations period is applicable to plaintiffs' breach

claims to the extent cognizable as actions to "recover on" the policies, that is to the extent

plaintiffs seek money damages in the form of unpaid benefits, whereas the statutory six-year

limitations period is otherwise applicable to plaintiffs' breach claims, that is to the extent

plaintiffs seek reimbursement of "expenses incurred in attempting to obtain their benefits" and/or

unspecified "injunctive remedies" in connection with defendants' alleged breach.[12]

---

[12]  In the event plaintiffs refile their fraud claim to the extent premised on fraudulent
inducement to purchase insurance policies from Bankers, such claim will be subject to a two-year
statutory limitations period.  *See* Or. Rev. Stat. 12.110(1).

Page 46 - OPINION AND ORDER

First, defendants argue that all of plaintiffs' claims are time-barred to the extent premised on premium rate increases, on the grounds that plaintiffs were advised of Bankers' right to raise policy premiums on or before the date they purchased insurance from Bankers, and that therefore the applicable limitations periods began to run as of the date the policies were purchased. As noted above, however, none of plaintiffs' claims are so premised. Defendants' first argument in support of their time-bar theory is therefore entirely inapposite.

Second, defendants argue that the applicable limitations periods began to run as to each of plaintiffs' claims to the extent premised on improper claims handling practices by not later than 2008, when 40 states (excluding Oregon) found that Bankers had engaged in a pattern of such practices. However, Bankers offers no grounds to support the conclusion that plaintiffs knew or should have known about these states' purported findings, which in any event would be without bearing on the question whether any individual plaintiff had an accrued claim of breach as of 2008 or any other time. Defendants' second argument therefore provides no grounds for dismissal of any plaintiff's claim in whole or in part.

Third, defendants argue that the claims brought by plaintiffs on behalf of Lorraine Bates and Eileen Burk are time-barred in their entirety. Defendants note that the Bates plaintiffs filed proof of loss on their claim for benefits in December 2009, and that the Burk plaintiffs filed proof of loss on their claim in April 2009. Defendants argue that the contractual three-year limitations period is applicable to these plaintiffs' breach claims in their entirety, and that the limitations period began to run as of the date proof of loss was filed in each case. Defendants note that this action was filed in April 2013.

I note, preliminarily, that these plaintiffs' claims are cognizable in part as claims other

than claims to "recover on" the applicable insurance policies, and therefore that to the extent

these plaintiffs seek reimbursement for expenses incurred in pursuing their claims for benefits,

their claims are subject to the statutory six-year limitations period and are clearly not time-barred.

I note further that even on the *arguendo* assumption that the dates these plaintiffs actually filed

proof of loss were also the dates by which proof of loss was "required to be given" (rather than

approximately 90 days thereafter), it appears likely from plaintiffs' allegations that the "loss" each

set of plaintiffs suffered was cognizable as a "continuing loss," and thus that while each set of

plaintiffs' claims for unpaid benefits might be time-barred in part, it is unlikely that such claims

are time-barred in their entirety as to either set of plaintiffs.

Because appropriate determination of what portion, if any, of these plaintiffs' claims for

unpaid benefits are time-barred will require consideration of evidence beyond the four corners of

plaintiffs' complaint, defendants' motion raises questions better addressed at summary judgment

than through a motion to dismiss. Because the requisite evidence is not now before the court, I

do not now construe defendants' motion as a motion for summary judgment, but rather deny the

motion at this pleading stage of these proceedings to the extent it addresses the limitations

periods applicable to the Bates plaintiffs' and Burk plaintiffs' claims for unpaid benefits. Such

disposition is without prejudice to defendants' right to raise these issues at a later stage of these

proceedings, after an evidentiary record has been developed.

### 3.    Certain Plaintiffs' Standing to Pursue their Claims

Defendants argue that the named (and absent) members of plaintiffs' putative Class C,

who by proposed definition have never filed any claim under their Bankers policies and whose

only asserted injury is concern that in the future their claims may be improperly handled, and the

named (and absent) members of plaintiffs' putative Class B, who by proposed definition have only filed claims on behalf of a family member, lack standing to pursue their claims before this court.

Where a plaintiff lacks constitutional standing to bring a claim, the federal courts lack jurisdiction to award relief on or to decide the merits of the plaintiff's claim. *See e.g.*, *Allen v. Wright*, 468 U.S. 737, 750-751 (1984). The Supreme Court articulated the three elements necessary for constitutional standing in *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). Under *Lujan*, a plaintiff must have suffered an injury in fact, there must be a causal connection between the injury and the conduct of the defendant, and it must be likely that the injury can be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-561. An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (citations omitted).

As to members of plaintiffs' putative Class C, I agree with defendants' argument in its entirety. These plaintiffs have not suffered any cognizable injury in fact, and therefore lack standing to pursue their claims. In consequence, defendants' motion to the extent premised on lack of standing is granted as to all of the claims brought by plaintiffs David Castagno and Darla Castagno, and as to the claims brought by plaintiffs Charles Ehrman Bates and Dolores Marier to the extent premised solely on those plaintiffs' concern regarding possible future breach.

As to members of plaintiffs' putative Class B, based in part on representations made by plaintiffs' counsel at oral argument I disagree with defendants' characterization of their claims. Specifically, it appears that plaintiffs intend to pursue claims filed in the names of these plaintiffs on behalf of their family members who actually sought benefits under their Bankers' policies

rather than on their own behalf.  That said, I agree with the defendants that, to the extent these

plaintiffs' claims may be construed as being pursued in their own behalf, these plaintiffs lack

standing and their claims are subject to dismissal.  The claims of plaintiffs Charles Ehrman

Bates, David Youngbluth, and Dolores Marier fall into this category.

### 4.    Injunctive Relief Sought

Defendants argue, on the basis of a decision of the Court of Appeals for the Seventh

Circuit holding that injunctive relief is inappropriate in class actions where such relief "would

merely lay an evidentiary foundation for subsequent determinations of liability," *Kartman v.*

*State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (citations omitted), that

plaintiffs' prayer for unspecified injunctive relief should be dismissed.  However, all class action

allegations have been stricken from plaintiffs' pleading, and this action was never certified as a

class action.  In consequence, the Seventh Circuit's holding is inapposite here.  Defendants'

motion is therefore denied to the extent it addresses purportedly impermissible relief prayed for

by the plaintiffs.

### 5.    Plaintiffs' Allegations of CNOFG's Liability

#### a.    CNOFG's Direct Liability

Plaintiffs' allegations of CNOFG's direct involvement in the conduct allegedly

constituting breach of contract or breach of the implied covenant of good faith and fair dealing

are plainly inadequate to support a finding of CNOFG's direct liability for breach.  A *sine qua*

*non* of a claim for breach is the existence of an enforceable agreement between plaintiff and

defendant, *see*, *e.g.*, *Slover v. Oregon State Bd. of Clinical Social Workers*, 144 Or. App. 565,

570 (1996), and plaintiffs do not allege that CNOFG was a party to the insurance agreement

Page 50 - OPINION AND ORDER

between Bankers and any plaintiff.  In consequence, CNOFG cannot be directly liable in connection with plaintiffs' claims of breach.

### b.    CNOFG's Indirect Liability

In the alternative to direct liability, plaintiffs allege CNOFG's indirect liability in connection with (*inter alia*) its breach claims on either an alter ego or an agency theory.  By contrast with CNOFG's challenge to this court's specific personal jurisdiction over it, to survive CNOFG's Rule 12(b)(6) motion on a theory of indirect liability, plaintiffs need only have made allegations sufficient (as construed in the light most favorable to plaintiffs) to support their theory of liability, and are not put to the burden of making a *prima facie* evidentiary showing.[13]

As to plaintiffs' alter ego theory, I note preliminarily that Oregon law requires plaintiffs to plead an alter ego theory of recovery as a separate count of their complaint, *Amfac Foods, Inc. v. International Systems & Controls Corp.*, 294 Or. 94, 104, n. 12 (1982), which plaintiffs have not done here.  Moreover, assuming *arguendo* that plaintiffs could trivially amend their pleading to cure that deficiency, it is clear that under Oregon law, "[t]he disregard of a legally established corporate entity is an extraordinary remedy which exists as a last resort, where there is no other adequate and available remedy to repair the plaintiff's injury," *id.* at 103, and that "the plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder," *id.* at 108.  Here, plaintiffs have not alleged that Bankers is judgment-proof in any sense, and still less that Bankers is judgment-

---

[13]   For purposes of determining whether plaintiffs have stated a claim against CNOFG upon which relief can be granted under Oregon law, I look to Oregon alter ego and agency law.

proof in direct consequence of CNOFG's improper conduct, as for example inadequate capitalization, milking, misrepresentation, or avoidance of Oregon's regulatory statutes. *See id.* at 108-110. In the absence of any such allegation, plaintiffs' elder abuse, breach, and intentional misconduct claims cannot proceed against CNOFG on an alter ego theory.

As to plaintiffs' agency theory, "[w]here the corporation's liability to the plaintiff is incurred while the corporation is acting as agent for the shareholder [or parent entity], the liability of the shareholder [or parent entity], as the principal, is governed by traditional agency and respondeat superior principles. In such a case it is not necessary to disregard the separate corporate status to impose liability upon the shareholder for obligations not met by the corporation." *Id.* at 102-103.

> Classically, an agency relationship "'results from the manifestation of consent by one person to another that the other shall act on behalf and subject to his control, and consent by the other so to act.'" *Vaughn v. First Transit, Inc.*, 346 Ore. 128, 135, 206 P.3d 181 (2009) (emphasis in *Vaughn* omitted) (*quoting Hampton Tree Farms, Inc. v. Jewett*, 320 Ore. 599, 617, 892 P.2d 683 (1995)). The agency relationship can arise either from actual consent (express or implied) or from the appearance of such consent. *See generally Taylor v. Ramsay-Gerding Construction Co.*, 345 Ore. 403, 410, 196 P.3d 532 (2008) (so discussing). In either circumstance, the principal is bound by or otherwise responsible for the actual or apparent agent's acts only if the acts are within the scope of what the agent is actually or apparently authorized to do. *Id.*; *see also Beeson v. Hegstad*, 199 Ore. 325, 330, 261 P.2d 381 (1953) (one cannot hold principal liable for an act that does not fall within the scope of agent's real or apparent authority).

*Eads v. Borman*, 351 Or. 729, 735-736 (2012).

Under settled Oregon law, "[a]pparent authority to do any particular act can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter." *Id.* at 736, *quoting Jones v. Nunley*, 274 Or. 591, 595 (1976). That is, "an agent's actions, standing

Page 52 - OPINION AND ORDER

alone and without some action by the principal, will not give rise to apparent authority. . . . Rather, the principal must take some affirmative step in creating the appearance of authority, one that the principal either intended to cause or 'should realize' likely would cause a third party to believe that the putative agent has authority to act on the principal's behalf." *Id.* at 737 (citations omitted). "There accordingly are two keys to the analysis: (1) the principal's representations; and (2) a third party's reasonable reliance on those representations." *Id.* at 736.

Here, plaintiffs make no allegation that CNOFG ever made any representation upon which any plaintiff could have reasonably relied (or actually relied) to the effect that Bankers acted in CNOFG's behalf rather than its own when it marketed, sold, or operated long-tern health-care policies in Oregon. To the contrary, although plaintiffs allege that "[p]olicy holders of Bankers Life claims are instructed to send their claim forms, documentation, and appeals of claim denials to CNO[FG]'s headquarters in Indiana," Second Amended Complaint at ¶ 21, that allegation references exhibits incorporated into plaintiffs' complaint establishing that the instruction was provided to Bankers' policy-holders by Bankers rather than by CNOFG, that the address in question purported to be Bankers' own address rather than that of CNOFG, and that the instruction made no express mention of CNOFG, *see id.*, Exh. 3 at 2806, 2818, 2858. In consequence, apparent authority is not at issue here.

Under Oregon law, actual agency liability is predicated on two requirements: the putative agent's complained-of conduct must have been subject to the putative principal's control, and the putative agent must have been acting on behalf of the putative principal in the course of engaging in the complained-of conduct. *See Vaughn v. First Transit, Inc.*, 346 Or. 128, 136 (2009); *see also id.* at 135-136. Here, plaintiffs clearly allege CNOFG's requisite control of Bankers, and in

Page 53 - OPINION AND ORDER

particular expressly allege that CNOFG controlled and directed Bankers' complained-of conduct. *See* Second Amended Complaint at ¶¶ 21-23, 25-26, 28-20.

As to the question whether Bankers acted on CNOFG's behalf rather than its own, plaintiffs variously allege that "[r]evenues from Bankers account for the vast majority of [CNOFG]'s income and profits," *see* Second Amended Complaint at ¶ 19, and that "CNO[FG] crossed the line from acting as a mere investor to treating Bankers as its own business," *see* Second Amended Complaint at ¶ 30. Construing these allegations in the light most favorable to the plaintiffs, I find that a trier of fact could reasonably conclude therefrom that Bankers conducted its business in Oregon on CNOFG's behalf rather than its own. In consequence, although I make no finding that Bankers actually was CNOFG's agent for material purposes, I find that plaintiffs' elder abuse, breach, and intentional misconduct claims may survive CNOFG's Rule 12(b)(6) motion on a theory of actual agency. CNOFG's Rule 12(b)(6) motion (#29) to dismiss is therefore denied as to plaintiffs' claims of breach.

## CONCLUSION

For the reasons set forth above, CNOFG's motion (#29) to dismiss is granted on personal jurisdictional grounds as to plaintiffs' fraud in the inducement claim to the extent alleged against CNOFG, and otherwise denied (in part as moot and in part on its merits, as discussed above), defendants' motion (#32) to strike class allegations is granted, and defendants' motion (#39) to dismiss is granted with prejudice as to plaintiffs' elder abuse and intentional misconduct claims in their entirety, with prejudice as to plaintiffs' fraud claim to the extent premised on a theory of fraudulent inducement to continue paying policy premiums pursuant to pre-existing insurance contracts, without prejudice as to plaintiffs' fraud claim to the extent premised on a theory of

Page 54 - OPINION AND ORDER

fraudulent inducement to enter into the insurance policies in the first instance, with prejudice as to the breach claims brought by the Castagno plaintiffs in their entirety and as to the breach claims brought by plaintiffs Charles Ehrman Bates and Dolores Marier to the extent premised solely on those plaintiffs' concern regarding possible future breach, and with prejudice as to the breach claims brought by plaintiffs Charles Ehrman Bates, David Youngbluth, and Dolores Marier to the extent brought on those plaintiffs' own behalf rather than on behalf of those plaintiffs' family members who sought benefits under their Bankers policies, and is otherwise denied.  Accordingly:  (i) all class action allegations are deemed stricken from plaintiffs' complaint; (ii)  plaintiffs' elder abuse claim is dismissed with prejudice in its entirety; (iii) plaintiffs' fraud claim is dismissed without prejudice to the extent alleged against CNOFG for lack of personal jurisdiction, dismissed with prejudice to the extent alleged against Bankers on a theory of fraud in the inducement to continue paying insurance premiums pursuant to existing contracts, and dismissed without prejudice to the extent alleged against Bankers on a theory of fraud in the inducement to enter into insurance agreements with Bankers; (iv) plaintiffs' intentional misconduct claim is dismissed with prejudice in its entirety; (v) plaintiffs' breach claim is dismissed with prejudice for lack of standing to the extent brought by the Castagno plaintiffs, to the extent brought by plaintiffs Charles Ehrman Bates and Dolores Marier and premised on those plaintiffs' concern regarding possible future breach, and to the extent brought by  plaintiffs Charles Ehrman Bates, David Youngbluth, and Dolores Marier on those plaintiffs'

/ / /

/ / /

/ / /

Page 55 - OPINION AND ORDER

own behalf rather than on behalf of those plaintiffs' family members who sought benefits under

their Bankers policies; and (vi) the Castagno plaintiffs are dismissed from this action.


Dated this 27th day of January, 2014.


 /s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge

Page 56 - OPINION AND ORDER